## FRUHAUF SOUTHWEST GARMENT CO. v. UNITED STATES.

### No. 49239.

United States Court of Claims.

May 5, 1953.

Max H. Walls, Philadelphia, Pa., for plaintiff.

Thomas H. McGrail, Washington, D. C., with whom was Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

The plaintiff, a Kansas corporation with its place of business at Wichita, Kansas, seeks to recover the sum of $48,560 alleged to be the difference between the amount paid by the defendant to the plaintiff and the amount due plaintiff under a contract whereby the plaintiff manufactured overcoats for the United States Army.

On June 28, 1946, the plaintiff and the defendant, acting through its Quartermaster Corps, War Department, entered into this contract by which the plaintiff agreed to manufacture and deliver to the defendant 30,000 overcoats, with removable liners, at a unit price of $19.25 for a total sum of $577,500 with monthly deliveries scheduled from February through December 1947.

In so far as applicable here, the contract provided in part as follows:

"14. Revision of Price: [Supplementary Contract Provisions].

"(a) The prices fixed herein may be increased or decreased in accordance with this Article.

"(b) *Times for negotiation.*—(1) Upon completion of delivery of thirty percent (30%) of the items to be furnished under this contract, the parties shall negotiate to revise the prices of all items theretofore and thereafter to be delivered. Within 5 days after the completion of delivery of said thirty percent (30%) the Contractor shall furnish to the Contracting Officer the statements and data referred to in paragraph (c) of this Article. At any time and from time to time after the completion of delivery of said thirty percent (30%), subject to the limitations specified in this Article, either the Government or the Contractor may deliver to the other a written demand that the parties negotiate to adjust the prices under this contract. No demand shall be made prior to 90 days after the completion of delivery of said thirty percent (30%) and thereafter neither party shall make a demand having an effective date within 90 days of the effective date of any prior demand, provided, however, that this limitation shall not be applicable in the event that during any 90-day period the War Labor Board or any similar Government agency shall authorize or order a change in wages, salaries or conditions of employment in the plants of the Contractor used in the performance of this contract. Each demand shall specify a date (identical with or subsequent to the date of the delivery of the demand) as of which the revised prices

shall be effective as to the deliveries made thereon and thereafter. This date is hereinafter referred to as 'the effective date of the price revision.' For the purposes of the first negotiation contemplated by this paragraph, the date of execution of this contract shall be deemed to be the effective date of the price revision. Any demand under this Article, if made by the Contractor, shall state briefly the ground or grounds therefor and shall be accompanied by the statements and data referred to in paragraph (c) of this Article. If the demand is made by the Government, such statements and data will be furnished by the Contractor within 30 days of the delivery of the demand.

(c) *Submission of data.*—At the time or each of the times specified or provided for in paragraph (b) of this Article the Contractor shall submit (i) a new estimate and breakdown of the unit cost and the proposed prices of the items remaining under this contract after the effective date of the price revision, itemized so far as is practicable in the manner prescribed by War Department Standard Procurement Form No. 3; (ii) an explanation of the differences between the original (or last preceding) estimate and the new estimate; (iii) such relevant shop and engineering data, cost records, overhead absorption reports and accounting statements as may be of assistance in determining the accuracy and reliability of the new estimate; (iv) a statement of experienced costs of production hereunder to the extent that they are available at the time or times of the negotiation of the revision of prices hereunder; and (v) any other relevant data usually furnished in the case of negotiation of prices under a new contract. The Government may make such examination of the Contractor's accounts, records and books as the Contracting Officer may require and may make such audit thereof as the Contracting Officer may deem necessary.

"(d) *Negotiations.*—(1) Upon the filing of the statements and data required by paragraph (c) of this Article, the Contractor and the Contracting Officer will negotiate promptly in good faith to agree upon prices for items to be delivered on and after the effective date of the price revision. Negotiations for price revisions under this Article shall be conducted on the same basis, employing the same types of data (including, without limitation, comparative prices, comparative costs, and trends thereof) as in the negotiation of prices under a new War Department contract.

"(2) After each negotiation the agreement reached will be evidenced by a supplemental agreement stating the revised prices to be effective with respect to deliveries on and after the effective date of the price revision (or such other later date as the parties may fix in such supplemental agreement).

"(e) *Disagreements.*—If within 30 days after the date on which the statements and data are required pursuant to paragraph (b) of this Article to be filed (or such further period as may be fixed by written agreement) the Contracting Officer and the Contractor fail to agree to revised prices, the failure to agree shall be deemed to be a disagreement as to a question of fact which shall be disposed of in accordance with Article entitled 'Disputes,' and the prices so fixed shall remain in effect for the balance of the contract notwithstanding any other provision of this Article.

"(f) *Payments.*—Until new prices shall become effective in accordance with this Article, the prices in force at the effective date of the price revision shall be paid upon all deliveries, subject to appropriate later revision made pursuant to paragraph (d) or (e) or (h)(2)(B) of this Article.

"Article 16. *Disputes.*—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under

this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall mail to the Contractor a written notification of his determination. Within 30 days from said mailing the Contractor may appeal to the Secretary of War, whose decision shall be final and conclusive upon the parties. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract."

On November 27, 1946, at the request of defendant's contracting officer, the parties executed a supplementary agreement wherein the unit price was reduced to $18.-50. This price revision was accomplished before any labor was commenced or work performed under the contract.

The plaintiff's entire operation under the contract was financed by the Union National Bank of Wichita, Kansas. As of late November and early December 1946, the plaintiff had loans from this bank which established a revolving line of credit in the total sum of $200,000 at 4 percent interest. Two separate loans were involved, each in the amount of $100,000 both of which were payable one year after date. To secure payment, the plaintiff gave its promissory notes and a chattel mortgage covering all of its machinery, equipment, furniture and fixtures, and assigned its accounts receivable and all money due and to become due the plaintiff under its contract with the defendant, and further secured the bank by assignment of warehouse receipts on all of its raw materials and finished goods.

On June 4, 1947, the plaintiff was instructed by the defendant to submit to the contracting officer the cost data required to be furnished under paragraph (c) of the Revision of Price article, supra. On June 18, 1947, after the plaintiff had delivered 30 percent of the overcoats, it submitted to the defendant its schedules of experienced costs to May 31, 1947, a profit and loss statement and other pertinent data required as a preliminary to a demand under paragraph (b), to negotiate a price revision. The plaintiff accompanied this information with a pro-

posal that the unit price of $18.50 remain unchanged for the balance of the contract quantity. Requests for further information in relation to its costs were made on the plaintiff by the defendant on July 7, August 4, and September 9, in 1947. The plaintiff supplied the information requested on those dates.

By letter of September 18, 1947, the contracting officer wrote to the plaintiff, in part, as follows:

"In connection with the revision of price clause in your contract, either the Government or the contractor may deliver to the other a written demand that the parties negotiate to adjust price under this contract, 90 days after the submission of the first demand.

"It is requested that you furnish this office with a new cost breakdown. The effective date of this new demand shall be 13 September 1947."

The plaintiff supplied the information desired by this request on October 20, 1947, which included a schedule of its experienced costs through September 30, 1947. These figures continued to support the original contract price, as modified, of $18.50 per overcoat. On October 23, 1947, the plaintiff's secretary-treasurer went to New York to negotiate for a revision of the unit price. The plaintiff's agent failed to see the contracting officer but met with three of his representatives. His efforts to discuss the plaintiff's cost figures with them was unsuccessful, and they offered the price of $14 per unit based entirely on the costs of another manufacturer. The plaintiff refused to agree to this price. The Government representatives countered with the proposition that the price would go to $15 per unit if the plaintiff would accept settlement immediately. The plaintiff again refused, and the Government representatives then stated that the unit price would be determined by unilateral action of the contracting officer. On October 28, 1947, the contracting officer took such action setting the price at $14 per unit. This figure was based upon the experienced costs of another manufacturer whose operations

were not comparable to those of the plaintiff. On this same date the defendant stopped making payments on the deliveries of overcoats by the plaintiff.

The stoppage of payments and proposed price reduction to $14 alarmed the bank officials in Wichita since the plaintiff as of October 31 was still indebted to the bank in the amount of $90,125. At the price of $14 per unit it became apparent that the plaintiff would not receive sufficient proceeds from the contract to pay its operational expenses and repay the loans. At this point the bank requested additional security from the plaintiff, stating that further funds would not be advanced and advised that legal steps would be taken to collect on the loan agreements if payment was not made on the due dates in late November and early December of that year. The plaintiff within a few days requested and received permission from the contracting officer relative to a reconsideration of the price determination of $14 per garment.

About November 10, 1947, the plaintiff's president and secretary-treasurer met with the Commanding Officer of the New York Quartermaster Purchasing Office, hereinafter referred to as the commanding officer. Several civilian employees of the defendant were present but the contracting officer was not present. No examination of the plaintiff's cost data was made at this conference and the defendant's representatives continued to assert that plaintiff's costs were higher than those of other manufacturers. No new price determination was made at that time although the Commanding Officer agreed to release the sum of $10,000 per week to enable the plaintiff to meet its payrolls.

On November 21, 1947, the contracting officer issued an amended unilateral finding setting the unit price at $15.

This price of $15 per unit did not placate the bank. Shortly after November 21, the bank officials notified the plaintiff that no more funds would be supplied and demanded payment of the loan obligation then due. Plaintiff replied that it would appeal the ruling of the contracting officer, but the bank officials stated that they would not wait for such a determination nor would the bank extend the date of payment of the obligations. Despite this notification, the bank did reconsider and allowed a one month extension on the notes.

On December 16, 1947, the plaintiff filed its appeal with the Secretary of War from the determination of the contracting officer which fixed the unit price at $15.

On December 31, 1947, the plaintiff's president and vice-president, at their request, met with the commanding officer, several other employees of the defendant, and the contracting officer. The plaintiff explained its financial condition involving its problem with the bank, relating that its purpose in desiring the conference was to avoid bankruptcy. After the defendant's representatives had first met with the officers of the plaintiff, the latter were asked to withdraw from the conference room so that the defendant's representatives could talk the situation over among themselves. The defendant's cost accountants asserted that on the basis of plaintiff's cost data to May 31, 1947, the highest unit price that they could recommend was $16.31. The defendant's conferees then decided that a possible settlement range could be supported somewhere between $16.31 and $16.90 which after further discussion narrowed to $16.55 and $16.75. From that basis of agreement a final figure of $16.66⅔ per unit, hereinafter referred to as $16.67, was decided upon and offered to the plaintiff. After first calling the bank in Wichita, the plaintiff's president accepted this figure. A supplemental agreement was then executed by the parties which contained the following clause:

"The contractor hereby represents that it has withdrawn its appeal of 16 December 1947 to the Secretary of War and further agrees to accept the unit price of $16.66⅔ as full and final settlement under the 'Revision of Price' article of subject contract."

On January 5, 1948, the plaintiff by letter withdrew its appeal relative to the $15 per unit determination.

The plaintiff delivered to the defendant 30,000 overcoats under the contract, for which it received payment at the unit price of $16.67 for a total sum of $500,000.

The parties stipulated that plaintiff's statements of experienced costs to May 31, 1947, and to September 30, 1947, are verified and supported by the plaintiff's books and records of account. Based on these figures (See finding 28) the adjusted unit cost as of September 30, 1947, would be $16.31. By applying a 10 percent profit to this figure the revised price would be $17.-94.

The plaintiff maintains that it is entitled to the full contract price of $18.50 per overcoat for the 18,500 coats delivered by September 13, 1947, and to the difference between $16.67 and $17.94 (approx. $1.27) on each of the remaining 11,500 garments delivered under the contract.

We will first consider the question as to the plaintiff's claim for $18.50 for each of the 18,500 overcoats delivered through September 13, 1947.

The plaintiff bases its claim for the price of $18.50 for the first 18,500 overcoats on the premise that the $18.50 as the existing unit price was to remain in effect under paragraphs (b) and (d)(2) of Article 14, and the first supplementary price agreement of November 27, 1946, until the parties took action upon a demand thereafter to revise it. This the plaintiff contends began with the contracting officer's letter (revision of price demand) of September 18, 1947. The revised price then was not finally determined until the second supplemental agreement of December 31, 1947, was executed. This set the price at $16.67 which, in conformity with the contracting officer's letter of September 18, was effective as of September 13, 1947. The plaintiff insists that this September 18 demand of the contracting officer was the second demand and negotiation of a price revision, and while admitting that the first such action occurred on June 4, 1947, upon delivery of 30 percent of the overcoats and request for cost data, etc., it is the plaintiff's position that this first effort was abandoned by the contracting officer. Plaintiff points to the language

of the September 18 letter as indicating that this was so, since it refers to that part of the contract which gives a party the right to request a price adjustment 90 days after the first demand. Thus, the plaintiff asserts the price of $18.50 remained in effect by reason of the supplemental agreement of November 27, 1946, until the effective date of second demand which was September 13, 1947.

Defendant contends that the first demand and action of the contracting officer under Article 14 for a price revision negotiation occurred on June 4, 1947; and that the price revision negotiations were in reality a continuing operation from the date until the execution of the December 31, 1947, supplemental agreement. Defendant points to the requests given to the plaintiff for additional information of July 7, August 4, and September 9, 1947, in support of its contention that the efforts toward a price revision, which began on June 4, had not come to an end at any time prior to the demand set forth in the September 18 letter.

We hold upon the facts that the efforts toward a price revision began on June 4, 1947, when the contracting officer first wrote to the plaintiff requesting its cost data and that the negotiations for revision of price pursuant to the demand of September 18, 1947, continued through to the December 31, 1947, agreement. All these requests for information and cost data were a part of a continuing effort on the part of the contracting officer to obtain from the plaintiff the needed information relative to a price revision. Although no evidence was introduced as to the defendant's requests of July 7, August 4, and September 9, the plaintiff in its petition stated that requests were made on those dates and complied with. The plaintiff is bound by such allegations. Scott v. Commissioner, 8 Cir., 117 F.2d 36, 40. We look upon the September 18 letter as nothing more than one more such request. By asking that a new cost breakdown be supplied as of a new date, the contracting officer was apparently seeking figures through another date in order that a comparison with the figures of the earlier period could be made.

Paragraph (c)(2) of the Revision of Price article in the contract supports this result. There it was stated that "after each negotiation the agreement reached will 'be evidenced by a supplemental agreement." Prior to September 18, 1947, no agreement had been reached by the parties under Article 14, based upon 30 percent completion of the contract and cost data required by paragraph (c). We are of the opinion that there was no such agreement within the contemplation of Article 14, until December 31, 1947.

The final question is whether the supplemental agreement of December 31, 1947, which established a revised unit price of $16.67 is binding on the plaintiff. It is the plaintiff's position that this agreement is voidable on its part because it was forced under economic duress to accept it. The plaintiff contends that it was placed in the position of having to accept the $16.67 figure because of dire financial straits which it alleges were caused by what it terms the arbitrary and unreasonable acts of the contracting officer in establishing the unit prices of $14 and $15 on October 28, and November 21, 1947, respectively. Plaintiff further asserts that it is not now estopped to question the validity or binding effect of the supplemental agreement of December 31, 1947, on the grounds that it did not first appeal to the Secretary of War. It points out that by the very terms of the Disputes clause of the contract (Article 16) no such appeal was provided for if the parties entered into a mutual agreement.

Defendant contends (1) that the plaintiff did not enter into the supplemental agreement under legal duress because the plaintiff's financial condition was of its own making after the original contract was made, and created circumstances for which the defendant could not be held accountable in connection with the assertion of its contractual rights under Article 14, and (2) that even if the plaintiff did find itself to a certain extent under economic duress, it may not now attack the validity of the supplemental agreement since it failed to repudiate it and appeal to the Secretary of War, as provided in Article 16 of the contract.

■■ The law of duress has broadened somewhat during recent years making it virtually impossible to arrive at any clear-cut definition, and the courts have stated that its application must of necessity depend upon the circumstances of each individual case. Morrill v. Amoskeag Sav. Bank, 90 N.H. 358, 9 A.2d 519, 524. An examination of the cases, however, makes it clear that three elements are common to all situations where duress has been found to exist. These are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. United States v. Bethlehem Steel Corp., 315 U.S. 289, 301, 62 S.Ct. 581, 86 L.Ed. 855; French v. Schoemaker, 14 Wall. (U.S.) 314, 332. In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities. In Du Puy v. United States, 67 Ct.Cls. 348, 381, this court stated:

"* * * In order to successfully defend on the ground of force or duress, it must be shown that the party benefited thereby constrained or forced the action of the injured party, and even threatened financial disaster is not sufficient. * * *."

It has become settled law that the mere stress of business conditions will not constitute duress where the defendant was not responsible for those circumstances. Lawrence v. Muter Co., 7 Cir., 171 F.2d 380, 382, certiorari denied, 337 U.S. 907, 69 S.Ct. 1049, 93 L.Ed. 1720; Silliman v. United States, 101 U.S. 465, 471, 25 L.Ed. 987.

The plaintiff was operating under financial conditions which did not allow for the delay in payment inherent in negotiations for a price revision. The plaintiff's officials knew at the time the loans were obtained that a redetermination of the price would in all probability be made. Wide differenc-

es of opinion between the parties as to just what weight should be given certain factors in determining that new price was not to be unexpected. The contract provided, by appeal to the Secretary of War, a remedy for any dissatisfaction which the contractor might have. The plaintiff was unable to avail itself of that procedure because of financial arrangements which were of its own creation.

While it appears that the plaintiff reluctantly and perhaps involuntarily accepted the $16.67 price because circumstances under which it was operating its business permitted no other alternative, we do not look upon the prior price determinations of the contracting officer of $14 and $15 per unit, even though they may have been arbitrary, as constituting coercive acts upon the part of the defendant. Following each of these determinations the plaintiff requested and was granted a rehearing and reconsideration, although the defendant's representatives could have denied such requests and left the plaintiff to its remedy under the contract which was an appeal to a higher administrative authority. Such consideration on the part of the defendant's agents hardly lends itself to a finding of coercion.

The plaintiff in both its brief and oral argument laid great stress on Shewan & Sons v. United States, 73 Ct.Cls. 49, as controlling here on the question of duress. We find that case to be distinguishable on its facts from the instant case and a review of it is unnecessary here. We conclude that further discussion of plaintiff's claim of duress is unnecessary in view of the circumstances of the case and the provisions of Article 16 of the contract.

If plaintiff did not act under such duress as would invalidate the agreement, and we believe that it did not, then the supplemental agreement with its unit price of $16.67 is valid, and the plaintiff is bound by its terms. If on the other hand, the plaintiff accepted the $16.67 figure under duress, as it contends, then no mutual agreement as contemplated by Article 16 of the contract ever existed.

Article 16 of the contract provided in part:

"* * * all disputes concerning questions of fact which may arise under this contract, *and which are not disposed of by mutual agreement,* shall be decided by the Contracting Officer, who shall mail * * *. Within 30 days from said mailing the Contractor may appeal to the Secretary of War * * *." (Italics ours.)

The plaintiff contends that under the italicized clause set out in Article 16 above, no appeal is provided for where the parties enter into a mutual agreement as distinguished from a unilateral decision of the contracting officer. The plaintiff, in order to avoid the effect of Article 16, asserts that a mutual agreement was entered into here, and then proceeds in an attempt to avoid the binding effect of such agreement. The defendant, while not discussing directly the interpretation of Article 16, contends that the plaintiff should have appealed to the Secretary of War on the basis of the validity of the supplemental agreement and having failed to do so, it is now estopped to question the binding effect thereof.

The plaintiff is correct in its contention that the language of Article 16 excluded an appeal to the Secretary of War if the parties entered into a mutual agreement. That is a logical result since the very purpose of such an agreement would be to eliminate the need or necessity for an appeal. However, if the plaintiff entered into this supplemental agreement under duress, as it contends, then we are unable to accept the plaintiff's further contention that a mutual agreement, as contemplated by Article 16, was executed.

Duress involves a step beyond mere illegality and implies that a person has been unlawfully constrained or compelled by another to perform an act under circumstances which prevent the exercise of free will. Bartlett v. Richardson, 27 Ohio App. 263, 161 N.E. 403, 405. It is because of the absence of this element of free will that the courts will refuse to enforce contracts where duress is shown to exist. Mutual assent on the part of both parties is essential to the creation of any binding agreement. Monroe v. United States, 35 Ct.Cls. 199, 206; affirmed, 184 U.S. 524, 22 S.Ct.

444, 46 L.Ed. 670; Restatement of Contracts, Sec. 3. When assent is lacking on the part of one side, we have nothing more than the acceptance by one party of the views of another. If the plaintiff acted under duress in executing the supplemental agreement then what resulted was no different than a unilateral decision of the contracting officer. What was incorporated into the agreement was not a compromise, but was merely the plaintiff's unwilling adherence to a decision of the defendant's authorized agent.

From that decision the only avenue of relief was by an appeal to the Secretary of War. That such an appeal is a prerequisite to seeking redress in the courts is made certain in United States v. Blair, 321 U.S. 730, 736, 64 S.Ct. 820, 823, 88 L.Ed. 1039. That case presented a situation wherein the contractor sought to bypass the appeal provisions of his contract, because the contracting officer, while agreeing with plaintiff, refused to take proper action or to make a written finding and decision. The Court in rejecting the contractor's contention and claim stated:

"* * * Even if the conduct of the Government superintendent or contracting officer, or their assistants, was so flagrantly unreasonable or so grossly erroneous as to imply bad faith, the appeal provisions of the contract must be exhausted before relief is sought in the courts."

The position of the Court in the Blair case, supra, was reiterated in the later case of United States v. Holpuch Co., 328 U.S. 234, 240, 66 S.Ct. 1000, 90 L.Ed. 1192. As pointed out in both cases the only relief from this rule is a showing that the appeal procedure is inadequate or unavailable. There is no such showing here.

Upon the facts and under the provisions of the contract in this case the plaintiff is not entitled to recover and its petition is dismissed. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN and WHITAKER, Judges, concur.