**Joseph E. O'HANLON, Jr.**

v.

**UNITED STATES.**

No. 450–84C.

United States Claims Court.

Nov. 24, 1986.

David M. Landay, Pittsburgh, Pa., attorney of record for plaintiff.

John S. Groat, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Lt. Col. Marshall M. Kaplan, and Maj. Wayne H. Price, Office of the Judge Advocate Gen., Dept. of the Army, of counsel.

## OPINION

YOCK, Judge.

In this military pay case, plaintiff, Joseph E. O'Hanlon, Jr., seeks: (1) Selected Ready Reserve duty pay and allowances for all inactive duty administrative drills that he attended between September 18, 1978 and August 31, 1981, for which he did not receive compensation, and (2) reinstatement in the Selected Ready Reserve and reserve duty pay and allowances due an officer in the grade of major for participation in 48 inactive duty for training drills per year from August 31, 1981 to the present.

The parties have now cross-moved for summary judgment. For the reasons discussed herein, the defendant's motion is granted, the plaintiff's cross-motion is denied, and the plaintiff's complaint is to be dismissed.

*Facts*

Both parties have moved for summary judgment in this action on the basis that the material facts are not in dispute.

From September 18, 1978 to August 31, 1981, plaintiff, Joseph E. O'Hanlon, Jr., was an Army reserve officer assigned as a supply/administrative officer with the 2073 United States Army Reserve School (USAR School) in Pittsburgh, Pennsylvania. His assignment involved performing supply duties as well as performing such administrative/personnel duties as keeping the personnel service records current, answering correspondence, dealing with Officer Efficiency Reports (OERs), and taking care of the awards program at the USAR School.

During his tour with the USAR School, the plaintiff was classified as a member of the Selected Ready Reserve in training/pay Category A. Under federal law, 10 U.S.C. § 270 (1976), Department of Defense Regulation, 32 C.F.R. § 101.5 (1981), and Department of the Army Regulation (AR) No. 140–1, plaintiff was required to participate in 48 scheduled drills or inactive duty for training (IDT) assemblies per year as well as attend a minimum of 14 days of Active Training (AT) drills per year. The plaintiff participated in, and received pay and retirement point credit for each of these 48 scheduled drills, as well as for his two weeks annual active duty for training.

United States Army Reserve Schools, such as the one to which Major O'Hanlon was assigned, conduct 48 Unit Training Assemblies (UTAs) per fiscal year. Army Regulation (AR) 140–1, § 3–4(e)(3). Satisfactory completion of a UTA entitles a reserve service member to one day's pay and retirement credit. AR 140–1, § 3–4(a)(b). A service member, who is unable to or, for other reasons, does not complete a UTA, may obtain credit either by (1) constructive attendance, (2) equivalent training, or (3) regularly scheduled training. AR 140–1, §§ 3–10 through 3–12.

In addition to these statutorily and regulatory required training drills, the Commanding Officer of the USAR School had

published a directive in August of each school year at issue, which listed the training schedules for the upcoming year. The directive stated in pertinent part:

15 August 1981

SUBJECT: Training Dates School Year 1981/82

TO: STAFF AND FACULTY

1. Attached is a list of Training dates for the school year 1981/82. Regularly Scheduled Unit Training Assemblies (RSUTA's) are annotated "Pd" which signifies a paid drill. Administrative drills are annotated "Admin" and are mandatory for all staff officers and staff NCO's in the grades of E–8 and above. Administrative drills will be for retirement points only. This school has scheduled 48 RSUTA's or paid drills for all assigned members. Any drill performed for pay purposes on a date other than those scheduled will be classified as an RST or ET, as more fully explained below.[1]

Attached to the directive was a schedule/calendar that indicated the dates when the 48 paid drills would be held, and the dates when the non-pay "administrative drills," would be held. At the bottom of the schedule/calendar attachment was a note that stated "All staff officers and staff Senior NCO's (E–8 and above) are expected to attend Administrative Drills in uniform." There were approximately twelve to fourteen "administrative drills" scheduled in this manner per year.

It is these nonpay administrative drills that forms the basis for the plaintiff's first claim. By federal law, a reservist is entitled to compensation for each regular period of instruction or period of appropriate duty in which he is engaged for at least two hours, 37 U.S.C. § 206 (1976), and he may be given additional training or other duty without pay only with his consent. 37 U.S.C. § 1002 (1976). Plaintiff asserts that from September 1978 to August 31, 1981, he was forced to attend, by order of the Commanding Officer and as a requisite to

continued unit membership at the USAR School, approximately 72 unpaid and mandatory administrative drills. Because he did not "consent" to attend the unpaid drills, plaintiff contends that federal statutes and the governing regulations were violated. Therefore, plaintiff claims that he is entitled to reserve duty pay and allowances for each unpaid administrative drill that he attended.

In his complaint, plaintiff contends that, due to his civilian employment and his allegedly involuntary attendance at the USAR School's unpaid administrative drills, a considerable strain was placed on his professional and private life. As a result, the plaintiff sometimes missed the scheduled administrative drills and/or attended the drills without wearing his uniform. In addition, the plaintiff would on occasion discuss his dissatisfaction about having to attend the unpaid administrative drills with other members of the staff and faculty at the USAR School. These occurrences finally came to the attention of the Commanding Officer of the USAR School, Col. Robert L. Reese, who, after some preliminary discussions with the plaintiff and his section head (Col. John A. Brancozio), called a meeting with the plaintiff on August 30, 1981. At that meeting, the plaintiff reiterated his dissatisfaction with attending the unpaid administrative drills and indicated that he would not be interested in accepting any promotions to section head or other assignments if such promotions mandated that he would always have to attend the unpaid administrative drills. Based on this discussion, Colonel Reese indicated that it would be best if the plaintiff transferred to the Individual Ready Reserve (nonpay) and look for another assignment in the Army Reserves. Colonel Reese had prepared the transfer documents ahead of time and offered the plaintiff the opportunity to sign them at the meeting. The plaintiff signed the documents at that meeting which resulted in his transfer to the Reserve Components

1. The language contained in this directive was identical (or similar in all material respects) to all the directives issued from August 1978 through August 1982.

Personnel and Administrative Center (RCPAC) as a member of the Individual Ready Reserve, effective, August 31, 1981. Members of the nonpay Individual Ready Reserve may voluntarily elect to complete correspondence courses, without pay, for retirement credit.

It was the events that took place at this August 30, 1981 meeting between Colonel Reese, Colonel Brancozio, and the plaintiff that form the basis for the plaintiff's second claim for reinstatement and back pay based on the plaintiff's contention that he was coerced into relinquishing his pay assignment with the USAR School and transferring into the nonpay Individual Ready Reserve.

A member of a Selected Ready Reserve pay unit cannot be involuntarily transferred to the Individual Ready Reserve unless the requirements of AR 104–10, § 2–20 have been followed. That regulation required that a Commanding Officer could only *recommend,* to higher authority, the officer's transfer after he had notified the officer of his right to rebut the recommendation. Two levels of higher authority would then have to concur in the Commanding Officer's recommendation before any involuntary transfer would occur.

Plaintiff alleges that because his transfer was involuntary, it was in violation of federal law and the applicable regulations. As a result, plaintiff seeks reinstatement in the Selected Ready Reserve and reserve duty pay and allowances due an officer in the grade of major for participation in 48 inactive duty training assemblies per year from August 31, 1981 to the present.

On September 4, 1984, plaintiff filed a motion for class action certification, which motion was denied on January 10, 1985. *O'Hanlon v. United States,* 7 Cl.Ct. 204 (1985). Thereafter, on April 19, 1985, defendant filed the instant motion for summary judgment, which was followed by the plaintiff's cross-motion for summary judgment filed on October 18, 1985.

*Discussion*

The defendant moved first for summary judgment in this action on the grounds that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law. Specifically, the defendant asserts that (1) there is no statute or regulation which authorizes compensation for attendance at administrative drills, (2) the plaintiff is not entitled to reinstatement and back pay in the Selected Ready Reserve because he voluntarily relinquished his position with his pay unit, and (3) in any event, the plaintiff is precluded from raising these issues because of laches.

Because the defendant's position is so clearly supported on the merits, the Court will not invoke the equitable doctrine of laches, even though the Government's case for laches has considerable strength.[2]

A. Administrative Drill Pay Claim

■ Because plaintiff seeks to recover military pay and allowances, he must base his claim upon a statute or regulation. *United States v. Larinoff,* 431 U.S. 864, 869, 97 S.Ct. 2150, 2154, 53 L.Ed.2d 48 (1977); *Bell v. United States,* 366 U.S. 393, 401, 81 S.Ct. 1230, 1235, 6 L.Ed.2d 365 (1961). Under the Tucker Act, 28 U.S.C. § 1491 (1982), an entitlement to money damages depends on whether any federal statute or regulation "can fairly be interpreted as mandating compensation by the Federal Government * * *." *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967). *See also United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Alexander v. United States,* 5 Cl.Ct. 57, 60, *aff'd,* 758 F.2d 667 (1984); *Uraga v. United States,* 4 Cl.Ct. 106, 109 (1983). For this Court to have jurisdiction, plaintiff must establish a "substantive right to receive presently due money damages by reason of the violation of the statute or regulations

2. Major O'Hanlon filed this action some three years after he was transferred from his Selected Ready Reserve pay unit, and it is clear that

memories have faded as to the critical events complained of in this action.

on which * * * [he] base[s] * * * [his] claims." *Adair v. United States,* 227 Ct.Cl. 345, 353, 648 F.2d 1318, 1324 (1981).

Plaintiff cites 37 U.S.C. § 206 as creating an entitlement to compensation for the unpaid administrative drills that he attended. This statute provides:

> § 206.  Reserves; members of National Guard: inactive-duty training
>
> (a) Under regulations prescribed by the Secretary concerned, and to the extent provided for by appropriations, * * a member of a reserve component of a uniformed service who is not entitled to basic pay under section 204 of this title, is entitled to compensation, at the rate of 1/30 of the basic pay authorized for a member of a uniformed service of a corresponding grade entitled to basic pay, *for each regular period of instruction, or period of appropriate duty,* at which he is engaged for at least two hours, * * or for the performance of such other *equivalent training, instruction, duty, or appropriate duties, as the Secretary may prescribe.*

37 U.S.C. § 206(a) (1976) (emphasis supplied).

Plaintiff also relies on 37 U.S.C. § 1002(a) and 10 U.S.C. § 683 to support his contention.  Section 1002(a) of Title 37 provides:

> (a) A member of the National Guard, or of a reserve component of a uniformed service, may *with his consent,* be given additional training or other duty as provided by law, without pay, as may be *authorized by the Secretary* concerned.

37 U.S.C. § 1002(a) (1976) (emphasis supplied).  Furthermore, 10 U.S.C. § 683 provides:

> (a) *Subject to other provisions of this title,* any Reserve may be ordered to active duty or other duty—
>
> (1) with the pay and allowances provided by law; or
>
> (2) *with his consent, without pay.*

10 U.S.C. § 683(a) (1976) (emphasis supplied).

Plaintiff claims that these provisions were violated because he was allegedly forced to attend, by order of his Commanding Officer and as a requisite to continued unit membership at the USAR School, additional unpaid administrative drills.  Because his attendance at the administrative drills was not voluntary, plaintiff asserts that he never "consented" to attendance at the unpaid drills.  Therefore, plaintiff argues that because the "consent" provisions of 37 U.S.C. § 1002(a) and 10 U.S.C. § 683(a) were not met, he is entitled to reserve duty pay and allowances for each unpaid administrative drill that he attended, pursuant to the payment authority contained in 37 U.S.C. § 206.

■ The plaintiff's argument is flawed for several reasons.  First, the statutes he points to do not mandate any payment to the plaintiff under the circumstances that he alleges.  37 U.S.C. § 206(a) (1976) specifically speaks only to payment of money for *"regular* period[s] of instruction, or period of appropriate duty, * * * as the Secretary may prescribe."  For USAR Schools, such as the one to which the plaintiff was assigned, *regular* periods of instruction are defined by Army Regulation (AR) 140–1, § 3–4(e)(3).  Pursuant to this regulation, 48 IDT *regular* assemblies are required to be conducted each year.  AR 140–1, § 3–4(e)(3).  *See also* 32 C.F.R. § 101.3 (1978).  These are the *regular* drills that *must* be paid for.  Drills that are not defined as *regular* or appropriate substitutes for *regular* drills within these regulations are not required to be paid for under the mandate of 37 U.S.C. § 206(a) (1976).  Because the administrative drills at issue in this case are not *regular* drills as defined in the regulation, 37 U.S.C. § 206(a) (1976) simply does not apply to mandate any compensation to the plaintiff for attending these administrative drills.

Neither does 37 U.S.C. § 1002(a) (1976) nor 10 U.S.C. § 683(a) (1976) apply to the plaintiff's circumstance to support his contentions.  Both of these statutes simply state that a reservist may be ordered to additional training (or other duty) without

pay, with his consent as authorized by the Secretary. Nothing in these statutes could be construed *to authorize payment* to the plaintiff, however, if reservists are ordered to additional training without pay and without their consent. The statutes merely authorize one method of additional duty, *i.e.*, without pay if one consents. It in no way speaks or authorizes payment of money if a reservist is ordered to additional nonpay duty without his consent.

Thus, none of the statutes the plaintiff cites, authorizes or mandates that he be paid under the factual circumstances alleged herein.

Second, the pertinent regulations clearly preclude payment for any additional drills in excess of the required 48 IDT drills. AR 140–1, § 3–14 does allow for additional training assemblies (ATAs) (drills) on a pay basis under certain circumstances. Unfortunately for the plaintiff, these circumstances are not present in the plaintiff's case. AR 140–1, § 3–14 states in pertinent part:

> *a.* ATAs are for use by key unit personnel in the Selected Reserve, as determined by commanders. The ATA will be used only for training activities, such as preparation of training programs, lesson plans, training aids, training rehearsals, and unit training administration. ATA will provide for maximum training effectiveness during each IDT period.
>
> *       *       *       *       *       *
>
> *d.* An ATA, upon approval of the unit commander, may be divided into two periods of 2 hours each. Pay for ATAs will be authorized only when the individual has performed a minimum of 4 hours of training; furthermore, the ATA must be completed in the same 30–day training period. Carry over of one 2–hour period into another 30–day training period to accumulate 4 hours of duty for pay is not authorized. (See para 3–1*c.*)
>
> *e.* ATAs are authorized for use by all USAR TPUs; exceptions include AR-COM HQ, *USAR schools*, JAGC units, RTUs, MI detachments (strategic), military history, public information, Selective

Service detachments, and US Army Civil Preparedness detachments. [Emphasis added.]

Pay for additional drills at USAR schools is specifically precluded. Therefore, payment for the additional unpaid drills that plaintiff claims he was forced to attend is not authorized by the applicable regulations, and thus they cannot constitute "periods of appropriate duty" within the meaning of 37 U.S.C. § 206(a) (1976).

Third, the legislative history surrounding the statutes at issue in this case does not indicate that Congress intended to extend the provisions of 37 U.S.C. § 206 or the other statutes involved to require payment for additional drills that fail to meet the definition of either regular or appropriate duty.

Finally, the plaintiff's Commanding Officer at the USAR School simply had no authority to order the plaintiff to attend the additional drills at no pay without his consent. The defendant has cited this Court to several opinions of the Army's Judge Advocate General that so indicate, and these opinions are consistent with the regulations that have already been cited. Thus, the statutes and regulations clearly preclude any payment for the plaintiff attending additional drills, and the Commanding Officer lacked the authority to order the plaintiff to attend any additional drills without the plaintiff's consent. It is, of course, well settled law that the Government is not bound by the unauthorized acts of its agents. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Jackson v. United States*, 216 Ct. Cl. 25, 41, 573 F.2d 1189, 1197 (1978). Thus, even if the plaintiff is correct in his allegations that his Commanding Officer forced him to attend the additional administrative drills without his consent, it does not follow that he is entitled to be paid for those drills he attended. The regulations are crystal clear that there is no authority for *paid additional drills*.

In view of the above discussion, it follows that the plaintiff is not entitled to recover on his administrative drill pay claim.

**198**

### B. Reinstatement and Back Pay Claim

In his second claim for relief, the plaintiff asks the Court to set aside the transfer from his Selected Ready Reserve unit to the nonpay Individual Ready Reserve and award back pay and allowances. The plaintiff asserts that he is entitled to be reinstated to his former unit and that he be paid for all the drills he would have attended from the time of his transfer on August 31, 1981 to the present because he believes he was coerced into relinquishing his assignment with the USAR School.

Generally, the jurisdiction of the United States Claims Court extends to military personnel cases premised on an entitlement to back pay wrongfully withheld as the result of a void separation (or presumably an invalid transfer from pay to nonpay unit). *See, e.g., Skinner v. United States,* 219 Ct.Cl. 322, 594 F.2d 824 (1979). In these cases a "fiction" is recognized whereby an individual lawfully appointed to a federal position whose removal (or transfer) from that position contravened pertinent statutes or regulations is deemed to have never been removed (or transferred) from his position. *United States v. Wickersham,* 201 U.S. 390, 26 S.Ct. 469, 50 L.Ed. 798 (1906).

The plaintiff's allegation that he was "coerced" into submitting a request for reassignment, as a basis for voiding that action, is directly analogous to cases in which individuals have attempted to void civilian or military retirements on the basis of duress. Accordingly, the test established in those cases is controlling here.

Duress or coercion is not measured by a plaintiff's subjective evaluation of his particular situation, but by an objective test consisting of three elements:

> (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. * * *. [*Fruhauf Southwest Garment Co. v. United States,* 126 Ct.Cl. 51, 62, 111 F.Supp. 945, 951 (1953).]

*Murphy v. United States,* 209 Ct.Cl. 352, 364 (1976) (voluntary resignation of a first lieutenant in the Air Force Reserve);

*Christie v. United States,* 207 Ct.Cl. 333, 338, 518 F.2d 584, 587 (1975). However, not every unpleasant working arrangement or distasteful set of alternatives constitutes duress or renders a voluntary act involuntary. *Roskos v. United States,* 213 Ct.Cl. 34, 40, 549 F.2d 1386, 1389 (1977). Even though Major O'Hanlon may have felt that his choices were not pleasant, this fact in itself does not render his decision to transfer involuntary. *Kestner v. Department of Interior,* 229 Ct. Cl. 772, 775 (1982); *Christie v. United States, supra,* 207 Ct.Cl. at 338, 518 F.2d at 587–88.

■ Under the undisputed facts submitted in this action, it is clear that the plaintiff's act of signing his transfer documents at the meeting with his Commanding Officer and section head on August 30, 1981, did not amount to coercion. At that meeting, his Commanding Officer simply invited him to sign the transfer documents in the event he did not wish to continue to follow the orders and directives in existence at the USAR School. There was no order to sign the documents, nor were there any threats as to the consequences of not signing the documents. The Commanding Officer did make it clear to the plaintiff that he believed the administrative drills were necessary to maintain the high rated status of instruction and efficiency at the USAR School, and thus he desired all his officers to attend the drills. Furthermore, the Commanding Officer made it clear that he thought the plaintiff should sign the transfer documents if he could not or would not comply with the administrative drills directive.

The circumstances of the meeting, however, clearly allowed the plaintiff the choice of signing or not signing. Moreover, the regulations confirmed that the Commanding Officer did not have the authority to simply transfer the plaintiff at that point. AR 140–10, § 2–20 provided the procedures which had to be followed when there was to be an involuntary release of an officer from a pay unit assignment. According to the regulations, the Commanding Officer could only recommend, to higher authority, the officer's transfer after he notified the

officer in writing of his intentions and allowed the officer the right to rebut the recommendation. Two levels of higher authority would then have to concur before any involuntary transfer recommendation would be approved. In short, the regulations precluded the Commanding Officer from ordering any involuntary transfer at that August 30, 1981 meeting. Thus, the plaintiff could have said no and put the transfer burden on the Commanding Officer. *Christie v. United States, supra,* 207 Ct.Cl. at 338, 518 F.2d at 587. The fact that the plaintiff decided to sign the transfer documents at that meeting does not make the transfer involuntary, nor does it amount to coercion. Persons are presumed to know the law, and especially is this legal maxim apt in the case of a military officer with some fifteen years of service with the U.S. Army and who was dealing with Army administrative matters on a routine basis.

Moreover, had the plaintiff chosen to stand pat and fight, he might have been able to test whether the Commanding Officer could sustain his recommendation for transfer in the face of the Commanding Officer's apparent lack of authority to order the plaintiff to attend administrative drills without his consent.

In any event, the plaintiff simply has not made out his case for duress or coercion under the standards as enunciated in *Murphy, supra,* and *Christie, supra.* It follows that the plaintiff's second claim fails as a matter of law.

## CONCLUSION

For the reasons discussed above, the defendant's motion for summary judgment is granted, the plaintiff's cross-motion for summary judgment is denied, and the complaint is to be dismissed.