**William R. SHOAF, Petitioner,**

v.

**DEPARTMENT OF AGRICULTURE, Respondent.**

**No. 00–34148.**

United States Court of Appeals, Federal Circuit.

Aug. 7, 2001.

Corrie J. Yackulic, Schroeter, Goldmark & Bender, of Seattle, WA, argued for petitioner.

Geoffrey J.L. Brown, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David M. Cohen, Director; and Bryant G. Snee, Assistant Director.

Before RADER, GAJARSA, and LINN, Circuit Judges.

## DECISION

GAJARSA, Circuit Judge.

William R. Shoaf appeals a final order of the Merit Systems Protection Board ("MSPB" or "Board"), *Shoaf v. Dep't of Agric.*, 84 M.S.P.R. 524 (1999), which denied his petition for review of the Board's initial decision, *Shoaf v. Dep't of Agric.*, No. SE–0752–96–0462–I–2 (M.S.P.B. Sept.11, 1998). In the initial decision, considering only activities occurring subsequent to Shoaf's September 1993 position transfer, an administrative judge on the MSPB determined that Shoaf's resignation was not involuntary. Because the administrative judge failed to consider events that transpired from April 1990 through Shoaf's September 1993 transfer, we vacate and remand.

## BACKGROUND

Shoaf began his career with the United States Forest Service (the "agency"), which is a part of the Department of Agriculture, in 1978 as a seasonal GS–3 Forest Technician in Idaho. Later that year, Shoaf commenced full-time employment with the agency as a GS–5 Timber Sale Officer. He was promoted to a GS–7 position and then to a GS–9 position as a Presale Forester by 1981, which he maintained until 1987. In 1987, Shoaf was promoted to a GS–11 position as a Forestry Systems Analyst in the agency's national headquarters in Washington, D.C. He was again promoted to a GS–12 position the following year. From 1978 through 1990, all of Shoaf's performance ratings were either "fully successful" or "outstanding." The agency also awarded Shoaf merit certificates in 1983, 1987, and 1990.

In April 1990, Shoaf transferred from agency headquarters to the Ketchikan, Alaska area of the Tongass National Forest ("the Tongass"). By the time Shoaf went to the Tongass, he was well versed with federal statutes and regulations relating to timber sales.

Shoaf was placed "on the Tongass" to head interdisciplinary teams ("IDTs") responsible for preparing large timber sales in southeast Alaska. In this position, Shoaf headed the IDT responsible for preparing the Central Prince of Wales ("CPOW") sale of old-growth forest. The CPOW sale was extremely controversial; it garnered significant governmental and media attention and fostered a substantial amount of litigation concerning its legality.

In his first year on the Tongass, Shoaf carried out his duties well and again received "fully successful" and "outstanding" performance ratings. After Shoaf's first year on the Tongass, he recognized several agency activities pertaining to the CPOW sale that he believed violated statutory strictures binding the agency.

Between July 1991 and July 1993, Shoaf made several whistleblowing-type disclosures concerning timber management practices on the Tongass. In July 1991, Shoaf and his CPOW team produced and released a "falldown" report, which highlighted proposed logging activity outside of established project boundaries. Shoaf also advised David Rittenhouse, the Forest Supervisor who was Shoaf's second-level superior, that the 1991 "Notice of Intent"— which disclosed proposed agency action and possible alternatives to the public— contained disparities in the location and acreage of the CPOW sale. On December 13, 1992, Shoaf wrote a public comment letter in his capacity as a public citizen pertaining to the draft environmental impact statement ("DEIS") covering the CPOW project issued by the agency. In this letter, which was disseminated to the public, Shoaf stated that the proposal outlined in the DEIS would lead to an "unac-

ceptable" reduction of sustained timber development in the project area. Shoaf's public comment letter attracted national attention. United States Congressman George Miller, then Chairman of the House Natural Resources Committee, obtained a copy of Shoaf's letter and drafted a letter to Michael Espy, then Secretary–Designate of Agriculture, which pointed out Shoaf's concerns over the harvest rate in the Tongass region and requested an investigation of activity on the Tongass. Shoaf's public comment letter also attracted media attention. Further, in April 1993, Shoaf released another report he co-authored indicating that the agency's proposed "alternatives" contained "clearcut units" that exceeded the allowable limits. Additionally, prior to release of the CPOW environmental impact statement ("EIS"), Shoaf submitted a memorandum to the agency indicating that its decision to disregard the "multi-entry layout plan" in the EIS was undesirable. In several of the aforementioned disclosures, Shoaf alleged that the agency was violating statutory provisions, for example, directives of the National Energy Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1994) and the National Forest Management Act of 1976, 16 U.S.C. §§ 1600 *et seq.* (1994).

Just after Shoaf began to call attention to activities he considered violative of governing statutes, the agency took numerous actions detrimental to Shoaf's career. For example, on August 1, 1991, two weeks after release of the "falldown" report, Rittenhouse orally reprimanded Shoaf at a meeting in front of agency managers and his IDT. During 1992, David Arrasmith, Shoaf's immediate supervisor at the time, twice indicated that he was considering and being urged by agency management to remove Shoaf from his position. Shortly after Shoaf's public comment letter regarding the DEIS was publicized, Arrasmith prohibited Shoaf and other IDT leaders from speaking directly to the media, which had previously been a responsibility of IDT leaders. In early 1993, Shoaf was stripped of his responsibility for coordinating public comments on the CPOW DEIS, even though the other IDT leaders on the Tongass retained such responsibility for their respective projects. In March 1993, the agency assigned a "co-IDT leader" to work with Shoaf on the CPOW project. In spring 1993, the agency removed Shoaf's responsibility for leading the preparation and recommendation of the "preferred alternative" for the final EIS. On April 1, 1993, Arrasmith, with approval from Rittenhouse, gave Shoaf his first "not fully successful" performance rating in fifteen years. On May 5, 1993, the agency eliminated Shoaf's involvement in a project concerning "clearcut size" in the CPOW project area. Also in 1993, Arrasmith informed Shoaf that he could not meet with governmental auditors investigating possible violations of the Tongass Timber Reform Act, Pub.L. No. 101–626, 104 Stat. 4426 (1990). Shoaf was also prevented from meeting with the Director of Timber Management from the agency's headquarters in May 1993, and he was not asked to attend a national forestry conference in August 1993, which was attended by the Assistant Secretary of Agriculture, even though the other two IDT leaders on the Tongass attended these gatherings.

Pursuant to a reorganization effort in September 1993, the agency eliminated Shoaf's position. Shoaf voluntarily accepted a position as a "Special Projects Forester" with the timber staff in Ketchikan, Alaska under the supervision of Mr. Gene Eide. The agency created this non-supervisory position specifically for Shoaf; it did not exist prior to Shoaf's tenure and was abolished when he left that position. During portions of 1994, the agency provided him with absolutely no viable or meaningful assignments. Indeed, as of February

7, 1995, Shoaf indicated by letter to the Regional Forester, Mr. Phil Janek, that his last assignment had been given on November 2, 1994 and it lasted for a day and a half. Shoaf contends the agency deliberately "idled" him in an effort to persuade him to resign.

On February 28, 1995, Shoaf applied for retirement in conjunction with a separation incentive program under the provisions of the Federal Workforce Restructuring Act of 1994, Pub.L. No. 103–226, 108 Stat. 111 (1994). His resignation under that program became effective on March 31, 1995. On July 6, 1995, Shoaf filed a complaint with the Office of Special Counsel ("OSC"), alleging that retaliatory actions had been taken against him for making disclosures protected under the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8) (1994). On May 8, 1996, the OSC issued a notice of termination of its inquiry into Shoaf's complaint. On October 31, 1996, Shoaf appealed to the MSPB, alleging that his resignation was involuntary and based on constructive discharge due to his whistleblowing activity.

In the initial decision, to determine whether Shoaf's resignation was involuntary, the administrative judge only considered activities transpiring after Shoaf transferred to the timber staff in September 1993.[1] Based on that evidence, the administrative judge determined the agency's alleged efforts to "idle" Shoaf failed to constitute circumstances under which a reasonable person would be "forced" to resign. Therefore, the administrative judge concluded that Shoaf failed to show his separation was either a constructive removal action taken by the agency or that it was a "personnel action" under the

Whistleblower Protection Act, 5 U.S.C. § 2302(a)(2)(A), and consequently held that the MSPB lacked jurisdiction over Shoaf's appeal. The administrative judge then indicated that Shoaf's request for corrective action based on events occurring prior to his September 1993 transfer was moot, because he failed to establish that he should be reinstated on the grounds that his resignation was involuntary. Accordingly, the administrative judge dismissed Shoaf's appeal.

Shoaf petitioned the MSPB for review of the initial decision. Two members of the three-member panel summarily denied his petition for review and entered a final order. Vice–Chair Slavet dissented. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (1994).

## DISCUSSION

### A. Standard of Review

We must affirm the MSPB's decision unless it is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (1994); *Terban v. Dep't of Energy,* 216 F.3d 1021, 1024 (Fed.Cir.2000).

### B. "Involuntary" Dismissal

■ A decision to resign or retire is presumed to be voluntary. *Christie v. United States,* 207 Ct.Cl. 333, 518 F.2d 584, 587 (1975); *Staats v. United States Postal Serv.,* 99 F.3d 1120, 1123 (Fed.Cir. 1996). An employee who voluntarily resigns or retires has no right to appeal to

---

**1.** In the initial decision, the administrative judge assumed for purposes of his analysis that Shoaf met the burden of showing that he was engaged in protected whistleblowing activity. The administrative judge also noted

that Shoaf satisfied the requirement of exhausting OSC remedies prior to initiating this individual right of action appeal with the MSPB.

the MSPB. *Staats*, 99 F.3d at 1123–24. The MSPB possesses jurisdiction over an appeal filed by an employee who has resigned or retired if the employee proves, by a preponderance of the evidence, that his or her resignation or retirement was involuntary and thus tantamount to forced removal.[2] *Id.* at 1124; *Braun v. Dep't of Veterans Affairs*, 50 F.3d 1005, 1008 (Fed. Cir.1995). That is, an involuntary resignation constitutes a constructive removal that is appealable to the MSPB. *Mintzmyer v. Dep't of the Interior*, 84 F.3d 419, 423 (Fed.Cir.1996).

■ Further, we have recognized that the MSPB's jurisdiction and the merits of an alleged involuntary separation are "inextricably intertwined." *Schultz v. United States Navy*, 810 F.2d 1133, 1136 (Fed.Cir. 1987); *Dumas v. Merit Sys. Prot. Bd.*, 789 F.2d 892, 894 (Fed.Cir.1986). If it is established that a resignation or retirement is involuntary, the MSPB not only has jurisdiction, "but also the employee wins on the merits and is entitled to reinstatement." *Schultz*, 810 F.2d at 1136.

Employees typically ground involuntary resignation or retirement assertions on bases such as: the agency proposed or threatened an adverse action against the employee, *Cruz v. Dep't of the Navy*, 934 F.2d 1240, 1251–53 (Fed.Cir.1991) (en banc); the agency misinformed or deceived the employee, *Covington v. Dep't of Health and Human Servs.*, 750 F.2d 937, 942 (Fed.Cir.1984); or the agency coerced the employee to involuntarily resign or retire, for example, by creating working conditions so intolerable for the employee that he or she is driven to involuntarily resign or retire, *Braun*, 50 F.3d at 1007–08.

Shoaf's claim falls into the "coercion" category.

■ As a general proposition, to establish involuntariness on the basis of coercion this court requires an employee to show: (1) the agency effectively imposed the terms of the employee's resignation or retirement; (2) the employee had no realistic alternative but to resign or retire; and (3) the employee's resignation or retirement was the result of improper acts by the agency. *Christie*, 518 F.2d at 587; *Staats*, 99 F.3d at 1124. These guidelines were developed from the principles set forth by one of this court's predecessors in *Fruhauf Southwest Garment Co. v. United States*, 126 Ct.Cl. 51, 111 F.Supp. 945, 951 (1953). *Christie*, 518 F.2d at 587; *McGucken v. United States*, 187 Ct.Cl. 284, 407 F.2d 1349, 1351 (1969). In circumstances involving economic duress, the *Fruhauf* court recognized that it was "virtually impossible" to articulate a "clear-cut" definition of the law of duress. 111 F.Supp. at 951. Yet, pursuant to prior duress jurisprudence, the *Fruhauf* court determined that the three aforementioned elements were common to all situations in which duress had been judicially discerned. *Id.*

■ The three-prong *Fruhauf* test must be tailored to fit the circumstances of each case. We have repeatedly recognized, in light of the particulars of each case, that a reviewing tribunal should ultimately consider whether working conditions were made so intolerable by the agency that a reasonable person in the employee's position would have felt compelled to resign. *Middleton*, 185 F.3d at 1379 ("The employee must present allega-

---

**2.** When there is a question as to the voluntariness of a petitioner's resignation or retirement and the petitioner makes a non-frivolous allegation of that involuntariness, as in this case, an evidentiary hearing is required to determine whether the resignation or retirement was in fact involuntary. *Braun v. Dep't of Veterans Affairs*, 50 F.3d 1005, 1008 (Fed. Cir.1995).

tions of fact which, if proven, establish that a reasonable employee confronted with the same circumstance would feel coerced into resigning."); *Scharf,* 710 F.2d at 1574 ("[F]reedom of choice [is] the guiding principle [in an involuntariness determination]."); *Braun,* 50 F.3d at 1007–08 ("To determine whether a resignation or retirement is voluntary, a court must examine 'the surrounding circumstances to test the ability of the employee to exercise free choice.'" (citations omitted)). For example, the first *Fruhauf* element is inapplicable to most constructive discharge cases where no adverse action is currently pending; nevertheless, the appellant may still be coerced into an involuntary resignation based on a lack of free choice. *Braun,* 50 F.3d at 1008; *Heining v. Gen. Servs. Admin.,* 68 M.S.P.R. 513, 521 (1995).

█ It is axiomatic that we apply an objective standard in consideration of whether an employee involuntarily resigned or retired. *Id.* at 1007; *Christie,* 518 F.2d at 587. That is, "[t]he employee must present allegations of fact, which, if proven, establish that a reasonable employee confronted with the same circumstance would feel coerced into resigning." *Middleton v. Dep't of Defense,* 185 F.3d 1374, 1379 (Fed.Cir.1999).

█ To objectively determine whether a reasonable person in the employee's position would have felt compelled to resign, a deciding tribunal must consider the totality of the circumstances. *Perlman v. United States,* 203 Ct.Cl. 397, 490 F.2d 928, 933 (1974) ("This court has consistently examined the surrounding circumstances to test the ability of the employee to exercise free choice."); *Scharf,* 710 F.2d at 1574 ("To determine whether a resignation or retirement is voluntary, a court must examine the surrounding circumstances ...." (citation omitted)); *Covington,* 750 F.2d at 941–42 (same); *Braun,* 50 F.3d at 1007–08 (same); *Heining,* 68

M.S.P.R. at 519–20 ("[T]he voluntariness of the resignation or retirement [is] based on whether the totality of the circumstances supported the conclusion that the employee was effectively deprived of free choice in the matter."). In other words, in measuring the voluntariness of an employee's resignation or retirement, all of the activities surrounding his or her resignation or retirement, even events not immediately preceding the leave of employ, must be considered. Indeed, this court has recently stated that "[i]n determining whether an alleged act of coercion caused an employee's involuntary retirement, a court *need not limit* itself to any particular timeframe." *Terban v. Dep't of Energy,* 216 F.3d 1021, 1024 (Fed.Cir.2000) (emphasis added).

In *Terban* we recognized that the most probative evidence of involuntariness "will usually be evidence in which there is a relatively short period of time between the employer's alleged coercive act[s] and the employee's retirement." *Id.* While the *Terban* court affirmed the Board's determination that the employee at issue failed to establish his retirement was involuntary based primarily on three events occurring during the fourteen month period immediately preceding retirement, the administrative judge considered all of the evidence submitted by the employee, including evidence relating back four years prior to retirement. *Id.* at 1023–24. That is, the administrative judge in *Terban* decided the case having the totality of the evidence at hand, which allowed for consideration of all of the activity leading to the employee's retirement and provided context for an analysis of the events temporally close to the employee's retirement.

█ In the case at issue, the administrative judge failed to consider the events occurring on the Tongass prior to Shoaf's transfer to the timber staff in September

1993. While it is within the MSPB's discretion to give proper evidentiary weight to events occurring from April 1990 through September 1993 and to the events following Shoaf's transfer to the timber unit, the MSPB abused its discretion by completely failing to consider the pre-transfer activities concerning Shoaf on the Tongass. That is, events occurring from the time period commencing on the date of Shoaf's transfer to the Tongass in April 1990, including actions and inactions by his supervisors during the relevant time period and his transfer to the timber unit, must be considered as part of the totality of the circumstances in determining whether Shoaf's resignation was involuntary.[3] The level of evidentiary weight the MSPB must grant to events temporally further from Shoaf's resignation than the agency's post-transfer conduct is within its discretion; yet, such events must, at a minimum, be considered to place activity and inactivity more immediately preceding Shoaf's retirement into the proper context.

## CONCLUSION

Because the administrative judge failed to consider the totality of the circumstances surrounding Shoaf's resignation, we vacate and remand this case for a decision comporting with the precepts delineated herein.

*VACATED and REMANDED.*

## COSTS

Each party shall bear its own costs.

RADER, Circuit Judge, concurring.

The Board decided that Mr. Shoaf voluntarily resigned. The sole issue before this appellate court is whether substantial evidence supports that decision. This court vacates the Board's decision because it did not purport to consider events more than a year and a half before Mr. Shoaf resigned. Because Mr. Shoaf's employment from April 1990 through September 1993 in a different position under a different supervisor presents the remote possibility that the Department engaged in a surreptitious conspiracy to force his retirement, I join my colleagues in vacating and remanding. The issue on remand remains, however, whether, considering all circumstances, the Department deliberately idled and forced the retirement of Mr. Shoaf.

---

**3.** While Shoaf did not allege that his transfer to the timber staff was retaliatory, that transfer must be considered, at a minimum, to develop fully the contextual landscape framing Shoaf's resignation. For example, a proper issue for inquiry would be why a specific and limited position was created for an individual with Shoaf's credentials and background and how this action fits within the contextual landscape.