ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| Charles F. Day & Associates LLC | ) ASBCA Nos. 60211, 60212, 60213 |
| | ) |
| Under Contract No. W15QKN-11-C-0157 | ) |

APPEARANCES FOR THE APPELLANT: Jeffrey L. Roth, Esq.
Allen L. Anderson, Esq.
Ryan G. Blount, Esq.
 F&B Law Firm, P.C.
 Huntsville, AL

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
 Army Chief Trial Attorney
MAJ Stephen P. Smith, JA
CPT Meghan E. Mahaney, JA
 Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE PROUTY

This appeal involves employees of appellant, Charles F. Day & Associates LLC (CFD), performing services for the United States in Iraq above and beyond the written requirements of the above-captioned contract (the contract) during a critical moment of our war effort. For this, CFD may be owed recognition but not additional compensation. A significant portion of the evidence presented by CFD was not presented to the contracting officer when CFD submitted its claims and we do not possess jurisdiction over appeals resting upon such new factual bases. Moreover, we cannot compensate the company for expenses that it would have incurred even had it not performed out of scope work, and must deny it the damages it seeks in this appeal.

FINDINGS OF FACT

I.     The Award of the Contract and its Terms

The United States Army's Picatinny Contracting Center of the Picatinny Arsenal in New Jersey (the government) released the solicitation for the contract on April 7, 2011 (supp. R4, tab 564)[1]. The contract which came from this solicitation was generally for providing support personnel relating to artillery – much of it overseas in Iraq and Afghanistan (see R4, tab 1). The appeal before us involves two contract line

---

[1] The solicitation number was W15QKN-11-R-C001 (R4, tab 2 at 5).

item numbers (CLINs) in this larger contract. The first of these CLINs, CLIN 0005 (CLIN 5), was for the provision of three field service representatives (FSRs) to do work in Iraq on M109A5 self-propelled 155mm howitzers (the self-propelled howitzers) (R4, tab 1 at 8, 36). The second CLIN at issue, CLIN 0006 (CLIN 6), was for ten FSRs to do work on M198 towed 155mm howitzers (the towed howitzers), also in Iraq (*id.* at 9, 36). Of note, the contract included two option years for the FSRs referenced in CLINs 5 and 6 (*id.* at 15-16 (option year 1), at 22-23 (option year 2)).

A. The Work Required of the FSRs

Several contract provisions described the work to be performed by these FSRs. Section 6 of the performance work statement (PWS) provided in part that the contractor would provide the 13 FSRs set forth by CLINs 5 and 6:

> [W]ith primary focus on providing technical assistance; over-the-shoulder training; and onsite maintenance support of 24 [self-propelled howitzers] refurbished by the Maine Military Authority (MMA) and 120 [towed howitzers] refurbished by Joint Manufacturing & Technology Center (JMTC), Rock Island Arsenal. (24 [self-propelled] Howitzers are scheduled to arrive in Iraq by March 2011. [Deliveries of the towed howitzers]...are scheduled to commence February 2011 with deliveries of 8 howitzers per month thru April 2012)[.]

(R4, tab 1 at 36)

Section 6.1.1 of the PWS provided that the three FSRs working on the self-propelled howitzers would primarily be located in Taji, Iraq, in support of the Iraqi 9th Mechanical Division, though they would also support the howitzers during live fire exercises in Besmaya, Iraq (R4, tab 1 at 36). Section 6.1.2 of the PWS provided that the FSRs working on the towed howitzers would also have a primary location of Taji, along with supporting their howitzers during live fire exercises in Besmaya (*id.*).

The PWS also included a section on "deprocessing" the towed howitzers (R4, tab 1 at 36-37). "Deprocessing," in this context, simply means taking howitzers that were packed for shipment to Iraq and received there and making them operational (tr. 1/19-20, 22-23, 2/60-61). It is generally not considered to be a particularly difficult process (*id.*), and Mr. Andrews, one of CFD's lead FSRs, testified that, nominally, the howitzers covered by the CLINs could each be deprocessed by one FSR working one day, although it could take longer if they were in poor condition (tr. 2/60-61). In any event, section 6.2 of the PWS provided that the FSRs would

2

deprocess 80[2] towed howitzers at Camp Taji as they arrived from their refurbishment by the Rock Island Arsenal (R4, tab 1 at 36). This section of the PWS repeated the anticipated schedule from paragraph 6, noted above, with 8 towed howitzers to be delivered a month from February 2011 to April 2012 (*id.*).

The section of the PWS about deprocessing, section 6.2.1, entitled, "Specific FSR/Deprocessing Support Tasks," went into some detail about the actions that would be accomplished during the deprocessing and also included subparagraph g, that, in full, stated: "Provide [self-propelled howitzer] and [towed howitzer] Technical Assistance" (R4, tab 1 at 36-37).

### B. The Hours to be Worked by the FSRs

The hours to be worked by the FSRs were set forth in two locations in the solicitation. CLINs 5 and 6 both included the annotation "4680 hours/year/person when deployed" (R4, tab 1 at 8-9). The PWS states, in section 5.1, "Hours of Duty":

> On-site FSRs shall provide support as required to support the mission, including working extra hours, after-hours, and on weekends. The Contractor shall allocate 90 hours per work week for the FSRs deployed in...Iraq....

(R4, tab 1 at 36)

The 90-hour workweeks for deployed FSRs (4,680 hours per year in the CLINs also equates to 90 hours per week multiplied by 52 weeks in a year) caused a potential contractor (not CFD (*see* tr. 1/44-45)) to submit a question to the contracting officer (CO) prior to contract award:

> REF PWS paragraph 5.1 page 33 – Hours of Duty requires FSR's [sic] to perform a 90-hour work week. This would require working 13-hour days seven days per week. Sustained performance at this rate is extremely difficult. Our experience is that most everyone works a 72 hour week, 12 hours a day 6 days a week. Please clarify the anticipated work schedule for those deployed in Afghanistan and Iraq.

---

[2] We cannot reconcile the PWS referring to 80 towed howitzers needing to be deprocessed, while other portions of the PWS refer to FSRs being responsible for 120 towed howitzers and the delivery schedule references 15 months of deliveries at 8 towed howitzers per month, which multiplies to 120 towed howitzers. Fortunately, we need not resolve this seeming conflict.

3

(App. supp. R4, tab 237 at 4) In response, the CO wrote: "Answer: The 90 hour work week allows for FSRs to be on call to provide support to units as necessary" (*id.*). This question and response joined all other questions and responses submitted by contractors as part of the solicitation process and were formally incorporated into the solicitation as a modification to the solicitation dated April 25, 2011 (app. supp. R4, tab 257 at 2, item 5). Other questions and answers incorporated into the solicitation included one that asked what would happen to the FSRs after they had deprocessed the howitzers and whether they would "remain on [the] ground to continue FSR support to other M198 Howitzers." The response to this question was, "Yes. The FSRs remain on the ground." (App. supp. R4, tab 237 at 8) The response to another question stated that the self-propelled and towed howitzer mission in the contract was "to train Iraqi forces" (*id.*); and, in response to a question inquiring about "essential contracting tasks which are not clearly delineated in Para. 4.2.1.1," the CO responded that "[t]he essential tasks are 'supporting fielded LW155 howitzers in Iraq and Afghanistan'. As indicated in 4.2.1.1. There are services provided by FSRs in Iraq and Afghanistan." (*Id.* at 11)

Section 6.4 of CFD's proposal in response to the solicitation[3] addressed work hours and stated in relevant part:

> CFDay complies with the hours for the Iraqi based M198 and M109A5 FSRs, while deployed. The duty hours for all tours of duty identified in this contract will be complied with by CFDay, with the understanding that these may change to ensure the government's ability to continue its mission. The operational needs of the Combatant Commander will determine the duty hours for our FSRs and may reflect the same duty hours as the military personnel they are supporting. CFDay FSRs have always worked to accomplish mission essential tasks, to ensure the government's ability to execute its mission. CFDay has allocated 90 hours per week for the Iraq based FSRs which allows for them to be on call to provide support to units as necessary.

(App. supp. R4, tab 259 at 43)

On its face, CFD's proposal also appeared to include 90-hour workweeks for its CLINs 5 and 6 FSRs. To work through one example: Mr. Joseph Andrews was noted as a CLIN 5 FSR whose hourly rate was $27.86. At 40 hours a week times 52 weeks a

---

[3] The proposal was dated May 9, 2011 (app. supp. R4, tab 259 at 1).

year (2,080 hours[4]) multiplied by $27.86, we generate $57,948.80, which is the same number CFD provides for Mr. Andrews' salary. The overtime rate is listed as 90% of the base pay and is multiplied by the 2,600 hours expected for regular time and overtime to sum to 90 hours a week (50 hours a week times 52 weeks a year) to yield $65,192.40 overtime pay per year. (*See* app. supp. R4, tab 259 at 96)

At the hearing, CFD's chief executive officer Dr. Charles Day, attempted to explain away the inclusion of 90-hour workweeks in CFD's proposal by stating that the 90% multiplier for overtime hours, rather than the 150% multiplier that CFD supposedly used for its employees was a reflection that CFD discounted the number of hours of overtime that it expected to pay its FSRs since it expected to be more efficient than the contract contemplated (tr. 3/20-22). This explanation is superficially attractive, but founders upon additional examination. First, and foremost, with the exception of its two team leads, CFD did not pay its FSRs any overtime premium, but, instead, paid them the rate for straight time[5] (*see, e.g.,* app. supp. R4, tab 469 at 21-24 (payroll sheets for the FSRs)). With the 90% multiplier applied to the 50 hours per week of time above 40 hours, we calculate 85 hours per week of straight time – almost exactly the 84 hours of straight pay that CFD paid its non-supervisory FSRs.

At the hearing, and repeated in CFD's post-trial brief, Dr. Day testified that it would have been "unethical" to charge the government for 4,680 hours per year per FSR in its proposal because it would not have needed to work those hours to perform the contract (tr. 3/37; *see* app. br. at 10). How CFD reconciles this statement with its proposal, that facially does charge the government for 4,680 hours per FSR per year, is not explained.

Of note, on June 6, 2011, Dr. Michael Santens, CFD's chief operating officer, sent an email to the government stating that CFD had miscalculated the hours it would pay its employees for both a contract modification on a pre-existing contract and for its response to the solicitation at issue here (R4, tab 2 at 2). Two days later, on June 8, 2011, Dr. Santens withdrew the June 6 letter, stating that, "[w]e are capable and willing to perform at the price submitted on both our proposals" (*id.*). The CO, Mr. Albert Rinaldi, responded to Dr. Santens on June 9, asking for verification of the prices in the proposal (R4, tab 2 at 1). On June 13, 2011, Dr. Santens emailed a letter to the CO, stating that it withdrew its email regarding miscalculation of labor rates and "confirm[ed]" its price proposal in response to the solicitation (*id.* at 5).

---

[4] The table also includes the number 2,080 over the "salary" column. It includes the number 2,600 over the "Overtime Pay" column (app. supp. R4, tab 259 at 96).

[5] Civilians deployed to Iraq did not necessarily get paid the time-and-a-half overtime premium that the casual reader might expect. *See, e.g., CACI International, Inc. & CACI Technologies, Inc.,* ASBCA No. 60171, 16-1 BCA ¶ 36,442 at 177,613-14.

## C. Contract Award, Modification 1, and its (Non)Effect on FSR Hours

The contract was awarded to CFD, and on June 30, 2011, Mr. Rinaldi executed it. Dr. Santens executed it on CFD's behalf the same day. (R4, tab 1 at 1)

On July 12 and 19, 2011, Dr. Santens and Ms. Rachael Houle (the then-CO) executed Modification No. P00001 (Mod 1) to the contract (R4, tab 3 at 1). As set forth in section A of this modification, the purpose of Mod 1 was to change certain dates of performance. With respect to the CLINs at issue here, 5 and 6, the purpose was set forth as, "[c]hange the Performance Completion Dates for CLINs 0005 and 0006 from 07 July 2011 – 07 July 2012 to 22 July 2011 – 23 July 2012" (R4, tab 3 at 2). Section A further stated that "[a]ll other terms and conditions remain the same" (*id.*).

The text that followed the portion of Mod 1 modifying CLINs 0005 and 0006 was similar to the text of the CLINs in the original solicitation except that the dates were changed as noted above and the original line, "4680 hours/year/person when deployed" was omitted (R4, tab 3 at 8). A similar omission was found for CLINs 0002, 0003, and 0004, which also included expected hours per FSR per year in the original contract (*see* R4, tab 1 at 7-8), but did not include it in Mod 1 (*see* R4, tab 3 at 7-8). Notably, CLIN 0003 was for an FSR to Australia and, in the original, noted 2,080 hours per year (R4, tab 1 at 7), which computes to 40-hour workweeks.

Dr. Day testified at trial that the omission of the hours in Mod 1 reflected the government's agreement with CFD's purported understanding that its deployed FSRs were not really expected to work 90-hour workweeks for a year (*e.g.*, tr. 1/66-68). There was no evidence presented at the hearing of any communication between the government and CFD that demonstrated this supposed mutual understanding, although Dr. Day testified that his assumption was based on communications involving a different contract. Contrary to Dr. Day's assumption, the government provided testimony that the omission in annual hours from the modifications revising the CLINs merely reflected the fact that these were unchanged and that it was unnecessary to reflect the unchanged portion of the CLINs in the Mod 1 text (tr. 4/38-39).[6] Notably, the portion of the PWS that provided for 90-hour workweeks for the deployed FSRs was not affected by Mod 1 (*see generally* R4, tab 3).

We find, factually, that the government's omission of hours in the text of Mod 1's revision of CLINs 5 and 6 was not intended to change the text of the original

---

[6] This is consistent with the way the texts of CLINs 0002, 0003, and 0004 were treated in that the text in the modification omitted the hours (*see* R4, tab 3 at 1-8), and it was clear that the parties had not intended to modify or delete the hour requirement.

contract with respect to the hours that CFD FSRs were expected to work and that there was no understanding between the parties that it did.

### D. Contract Terms Regarding the FSRs' Status in Iraq

As civilian employees of a government contractor during a time of great change in Iraq (as will be discussed herein, the American military presence in Iraq – temporarily – formally ended during the time of contract performance), the FSRs were in a potentially awkward position. Paragraph 4.1.1.1 of the contract provided some guidance on the matter, though not much that was particularly definite:

> Depending on the Status of Forces Agreement (SOFA) or other international agreements, all Contractor employees may be subject to the customs, processing procedures, laws, agreements and duties of the country in which they are deploying to and the procedures, laws, and duties of the United States upon re-entry. Contractor shall verify and comply with all requirements.

(R4, tab 1 at 30)

### II. Contract Performance and the Dispute About the Scope of Work

Performance on the contract duly began in July 2011, though CFD only provided the two senior FSR's at first, with the 11 others required by the contract coming several months later – 10 in September 2011 (tr. 2/24; R4, tab 9 at 1-2), and the final FSR in October 2011 (app. supp. R4, tab 558 at 4).

The FSRs performed some work on the trucks used to haul the howitzers that was beyond the scope of the contract, but, according to one of CFD's two lead FSRs, Mr. J. Andrews, such work was minor, like changing batteries to get them to start (tr. 2/50-51). They also performed significant, depot-level maintenance on the howitzers based upon the condition in which they arrived in Iraq and some damage done to them by Iraqis during training (tr. 2/53-56). In the absence of this heavy maintenance, Mr. Andrews estimated that only 8 FSRs would have been necessary to complete the work, not the 13 actually on site (tr. 2/59).

In general, the attitude of CFD's FSRs on the ground in Iraq was to uncomplainingly do whatever needed to be done to ensure success of the mission in Iraq (tr. 2/49-50, 3/85-86). To that end, they were not particularly concerned about what duties were specifically set forth in the contract (one of the lead FSRs never read the contract (*see* tr. 2/22), and the other only did so summarily (tr. 3/71-72)), and they pitched in to help other contractors with their duties, just as other contractors' personnel

sometimes helped the CFD FSRs perform their duties (tr. 3/102). The CFD FSRs generally expected to work 12 hour shifts, seven days a week as one did in Iraq[7] (tr. 3/115-16). The regular rhythm of the workday (up at 5:00 a.m., breakfast around 6:00, escorted travel to the "yard" where work was performed, followed by escorted travel to and from lunch and then work at the yard until approximately 6:00 p.m. (*see* tr. 2/42), was consistent with the expected 12-hour days, and security considerations generally diminished the flexibility of CFD employees to come and go at will from their worksites (tr. 3/75-78, *see also* 3/140-41 (Iraqi military largely controlled access to worksites), 1/78 (transportation issues effectively imposed 12-hour workdays on the FSRs)).

Although CFD management was generally aware of the type of work actually being performed by its FSRs in Iraq (*see* tr. 2/25, 49, 121-22), not until sometime in late December 2011 did anybody from CFD ever complain[8] about performing allegedly "additional" work, and that came about in a telephone call where Army Colonel (COL) James Romero, apparently from the Office of Security Cooperation – Iraq, informed Dr. Day that the potential evacuation of the FSRs from Iraq at the end of that month (pursuant to the withdrawal of American military as discussed below) could be disastrous to the military mission and could cause the government to terminate the contract for default. Dr. Day, in this phone call, explained his view that the FSRs had responsibilities as limited by his interpretation of the contract, while COL Romero countered that the duties of the FSRs were to do what the government told them to do. It was at this point that Dr. Day recognized a disconnect between his view of the contract and the government's view (tr. 1/117-20). After his discussion with COL Romero (who Dr. Day never dealt with again), he contacted Ms. Ethington, the COR, and informed her of the divergent views of the contract. Ms. Ethington appeared to largely hew to COL Romero's view of the contract

---

[7] Testimony that CFD did not expect most of its FSRs to work more than 40 hours a week in Iraq (*e.g.*, tr. 2/166), is not consistent with the question submitted to the CO about work hours, nor the statement in CFD's proposal indicating that the duty hours would fit with the "operational needs of the combatant commander" and "may reflect the same duty hours as the military personnel" (app. supp. R4, tab 259 at 43), nor the Board's extensive experience involving contractors working hours in Iraq.

[8] As early as December 7, 2011, in an internal government email, the CO's representative (COR), Ms. Joyce Ethington, noted that CFD FSRs were performing out of scope work, but there was no indication in that email that CFD was complaining about extra incurred costs associated with that work or requesting to be relieved of the work (app. supp. R4, tab 476). At about the same time, the government internally considered modifying the SOW to include support work by the FSRs at Besmaya, which was seen as incurring no additional costs except travel (supp. R4, tab 580; tr. 4/101-03).

(tr. 1/121-22). Immediately after this phone call, Dr. Day sent an email to Ms. Ethington stating, for the first time that, "[t]he reports I am getting lead me to believe we are performing maintenance support that is likely included in another companies [sic] NET scope" (R4, tab 31 at 2). In the context of the discussion, our view of the evidence was that Dr. Day raised this matter not for financial reasons, or to request the work be reduced, but to defend the quality of the work that his employees were providing and to argue that they should be allowed to evacuate to Kuwait for safety reasons without any negative effects on CFD's contract (*see* R4, tab 31).

Dr. Day testified that he raised the issue with the CO, Mr. Rinaldi, sometime in October or November of 2011, and that Mr. Rinaldi explained that he bought "hours," not specified work, from the FSRs (tr. 1/141-46). We believe that Dr. Day is mistaken in his timing because there is simply no documentary evidence of it, nor corroborating evidence, and the December 22, 2011 email appears as if the subject were just then being raised by Dr. Day, as opposed to a matter he had raised a few months earlier (*see* R4, tab 31). This interpretation is supported by Mr. Rinaldi's testimony that he only spoke with Dr. Day in the presence of others and did not do so until December 2011 (tr. 4/107-08, 127).

## III.   The Temporary Evacuation of the FSRs from Iraq

On December 31, 2011, the SOFA between the United States and Iraq expired, and the United States withdrew all combatant military forces from Iraq before this deadline (tr. 1/114-15, 2/113-14). The government of Iraq also required all civilian contractors working for the United States in Iraq to have work and travel visas (tr. 1/114-15).

Because of concerns regarding security and the fact that the Iraqi government had not yet provided the work visas to the FSRs, CFD withdrew them to Kuwait from Iraq prior to the December 31 deadline (tr. 1/114-15, 2/114). There, they waited for their visas and returned to Iraq within a few weeks (tr. 2/116).

## IV.   Modification of the Contract to Descope the Number of FSRs

On March 12, 2012, Dr. Day sent an email to Martin Kane (a senior business manager for the Army on the contract (*see* tr. 4/94-95)), asking for the government to take a number of steps to help CFD financially. As Dr. Day's letter explained, CFD had built its cost estimate for the FSRs upon prior experience that showed that they would not need to work the entire 90 hours per week called for in the contract and that the difference in that projected cost and the cost of paying the FSRs for the 84 hours per week that they were actually working had "put me in the red to the point the business is at risk." (R4, tab 66 at 1) He asked for a number of remedial actions by the government, including paying for CFD's overtime for FSRs that worked more than

9

30 hours of overtime per week (*id.* at 1-2). Other remedial requests in this letter were to increase the payment of Defense Base Act insurance and to include "G&A" costs for travel as a direct cost (*id.*). We do not perceive these other remedial requests as related to the alleged "overtime" of the FSRs, but part of previous communications that CFD had apparently had with the government relating to underbidding the contract on those issues (*see* tr. 4/138).

The government did not agree to increased payments to CFD, but did agree to descope the contract by reducing the number of FSRs by six, so long as there was a corresponding pro-rata decrease in the amount paid to CFD (*see* R4, tab 71 at 2-3; tr. 1/147-48). CFD agreed to this change and the parties thus executed Modification No. P00005 (Mod 5) on April 3, 2012 for CFD and April 4, 2012 for the government (R4, tab 75 at 1). The net reduction in price was $282,876.40 (*id.* at 4). CFD also requested, as part of the modification process, that the additional option years for CLINs 5 and 6 be removed (R4, tab 71 at 3, tab 73 at 2), but Mr. Rinaldi declined to make that contract change, although he did represent that the government would not exercise the options (R4, tab 73 at 1). In the correspondence leading to the execution of Mod 5, Dr. Day stated that he considered the deletion of the options for CLINs 5 and 6 to be "an integral part of our proposal," but that he "underst[ood] your reluctance to delete them from the contract" (R4, tab 74 at 5).

CFD has argued that it did not agree to Mod 5 of its own free will and that it succumbed to economic duress (app. br. at 38-41). The written and other evidence presented does not support such a factual finding. With respect to Dr. Day's testimony that his company was in financial distress due to higher than anticipated costs for the contract (*see* tr. 1/146 (Dr. Day stating that the company was facing bankruptcy), 148-49), we find it highly plausible and have no reason to doubt this testimony. It is with respect to the threats allegedly conveyed by the CO that we believe there is exaggeration. Dr. Day testified that Mr. Rinaldi told him that he could find CFD in default for sending its FSRs to Kuwait and that he might exercise his option to require the FSRs for following years (tr. 1/147-48, 2/142-44). Dr. Day further testified that he considered Mr. Rinaldi to be threatening his company's financial well-being – effectively, "extortion" (tr. 2/144). Mr. Rinaldi's testimony is that he had no recollection of such a conversation (tr. 4/108) and that in his career as a CO he had never defaulted a contractor and would have never considered doing so in the CFD contract unless there was "no performance" (tr. 4/119). Indeed, under questioning from the presiding judge, Mr. Rinaldi was adamant that he would never have threatened CFD with default under the circumstances (tr. 4/140). There is no contemporaneous written documentation supporting Dr. Day's version of events and a review of the correspondence between the parties at the time of Mod 5 (*e.g.*, R4, tabs 71, 73-74) show the parties to be engaged in a respectful and professional dialogue, somewhat inconsistent with Dr. Day's testimony of perceived extortion. Ms. Patricia Martel, the CFD employee who handled much of this correspondence on behalf of CFD,

complained internally that a termination for convenience would be more appropriate than the descoping modification, but expressed no other complaints about the way the government handled it, nor did she hear of any threats to terminate the contract for default (tr. 5/17-18). Moreover, before filing its claims more than two years later, CFD never complained to the CO about Mod 5 being unfair (tr. 4/130). In sum: CFD found itself in a very difficult financial spot and did not get the exact relief that it wished for, but the government's behavior was not the "extortion" now alleged by CFD.

## V.    Conclusion of CLINs 5 and 6

After the execution of Mod 5, CFD sent the six descoped FSRs home. In an email dated April 26, 2012, Mr. Rinaldi formally notified Ms. Martel that the Army would not be exercising the options involving the Iraq FSRs (R4, tab 88 at 1). By mid-July, 2012, the remainder of the FSRs on CLINs 5 and 6 had completed their work on the CLINs and departed Iraq (R4, tab 212 at 4). There is no allegation that CFD was not paid the complete amount for the CLINs, as amended by Mod 5.

## VI.    CFD's Claims to the CO

On December 30, 2014, CFD submitted a document captioned as "Request for Equitable Adjustments" to the then-CO, Ms. Houle (R4, tab 212). This document delineated three separate "claims" in the aggregate amount of $1,583,827 (R4, tab 212 at 12[9]) and was accompanied by three separate certifications by Dr. Day, using language comporting with the Contract Disputes Act (CDA) (*id.* at 8, 10-11). We will refer to the three claims in the document as CFD's "claims" herein because, despite the document's label, it essentially conveyed three CDA claims to the CO.[10]

CFD's Claim 1 was for "Work on vehicles not included in [the] SOW."[11] In this claim, CFD alleged that its FSRs put in 1,104 hours of work on 7 ton trailers; 156 hours of work on a vehicle known as a HETT (apparently, heavy equipment transport, *see* app. br. at 17); and 1,560 hours working on M113 armored personnel carriers – all vehicles not set forth in the contract's PWS and summing to 2,820 hours. CFD also alleged that it put in approximately 4,320 hours of work on 270 other vehicles in Iraq that were not covered by the contract. This would add up to 7,140 extra hours of work, which CFD multiplied by its $88.50 rate for its FSRs, leading to a quantum of

---

[9] The page number here is not the page number of the Request for Equitable Adjustment document, but of the pages in tab 212 of the Rule 4 file – two higher than the number on the document, itself.

[10] A document entitled as a request for equitable adjustment can be considered a claim under the CDA, regardless of its title, if it otherwise meets the requirements of a claim. *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577-78 (Fed. Cir. 1995).

[11] The "SOW" (statement of work) is used interchangeably with the PWS in CFD's claims.

11

$631,890. (R4, tab 212 at 8-9) CFD largely, but not completely, abandoned this claim at trial (tr. 2/203, 3/34), with Dr. Day retracting earlier testimony withdrawing the claim but conceding that he realized, after the fact, that it "was significantly overstated" (tr. 3/34).

Claim 2 was for "Maintenance of Motor Pool." In it, CFD alleged that it was required by the Army commander to keep, on average, two FSRs at the motor pool waiting for work. According to CFD, this work, in part, was used to return the towed howitzers to usable status after they had been handed to the Iraqis and damaged. CFD estimated that the motor pool time was 2 employees at 12 hours a day for 10.5 months. or 7,560 hours, which CFD multiplied times its $88.50 rate, summing to $669,060. (R4, tab 212 at 10)

CFD's third and final claim was for "Restoration of funds deleted by MOD 7." In this claim, CFD alleged that, since CLINs 5 and 6 were firm-fixed-price contracts and CFD had completed all the work required of them, it should not have had to suffer the decrease in price caused by the descoping of the six FSRs by Mod 5.[12] This amount, as noted above, was $282,877. (R4, tab 212 at 11)

Nowhere in the entire claim document submitted by CFD was there any allegation that CFD employees were required to perform any out of scope work to deprocess howitzers that had arrived in-theater in worse condition than should have been anticipated (see R4, tab 212). Dr. Day conceded as much in his testimony at the hearing (see tr. 2/226), but explained that the reason the information was not in his claim was that, it was not until discovery in the present appeal that there was enough clarity to press forward with that allegation, though he believed the government knew about it all along (tr. 2/226-28).

The CO denied CFD's claims in a decision emailed to CFD on June 25, 2015, re-sending it on July 10, 2015, because Dr. Day had not responded (R4, tab 225 at 1). Generally, Ms. Houle argued that there had been no constructive change to the contract and CFD thus had no entitlement to compensation (id.).

On September 18, 2015, CFD appealed Ms. Houle's June 25, 2015 decision to the Board. The complaint repeated the three claims in the December 30, 2014 claim, and we docketed the appeals as ASBCA Nos. 60211, 60212, and 60213 for claims 1, 2, and 3, respectively.

---

[12] We do not know why CFD refers to contract Modification No. P00007 (dated May 24, 2012) as, to the best of our review, that modification does not involve the descoping in question (see R4, tab 95), which was accomplished by Mod 5. In the end it does not matter: all parties know and understand the point CFD was attempting to make.

## DECISION

### I.    Preliminary Matters

Before we reach the merits of the dispute before us, we must address two preliminary matters raised by the government.  First, in its opening brief, the government challenges our jurisdiction to consider the portion of the case presented by CFD at the hearing relating to the condition of the howitzers that they were required to deprocess, alleging that the basis is so different than the claim presented to the CO (effectively, a superior knowledge claim) that it should be dismissed (gov't br. at 20-25). Second, in a separate filing, the government demands that we strike two appendices to CFD's brief (gov't mot. to strike).  We grant both requests.

#### A.  We do not Possess Jurisdiction over CFD's Assertions that the Howitzers were in Materially Worse Condition than Represented by the PWS

We recognize that information known to the parties often changes from that known at the time that the claim was submitted to the CO as discovery and trial preparation bring facts more into focus.  To that end, we are relatively liberal in permitting appellants to present additional evidence and arguments not presented to the CO and to alter the legal bases for claims as well as the amount of damages.  *See, e.g., Madison Lawrence, Inc.*, ASBCA No. 56551, 09-2 BCA ¶ 34,235 at 169,207; *Newell Clothing Co.*, ASBCA No. 24482, 80-2 BCA ¶ 14,774 at 72,916 (changed amount of claim and the production of additional data).  On the other hand, a claim on one matter does not support jurisdiction over an appeal on another, *see Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003), and a claim must be specific enough and provide enough detail to permit the CO to enter into a dialogue with the contractor.  *E.g., Holk Dev., Inc.*, ASBCA Nos. 40579, 40609, 90-3 BCA ¶ 23,086 at 115,938-39.

The seminal case governing whether a claim submitted to a CO can support a somewhat different appeal under the CDA is *Scott Timber*.  In *Scott Timber*, the Federal Circuit held that appeals of CO final decisions "do[] not require rigid adherence to the exact language or structure of the original administrative CDA claim [so long as they] arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery."  *Scott Timber*, 333 F.3d at 1365; *see also Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,534; *Maersk Line, Ltd.*, ASBCA Nos. 59791, 59792, 16-1 BCA ¶ 36,405 at 177,512.  Stated somewhat differently, the Federal Circuit has held that the test for "[m]aterially different claims" is whether they "will necessitate a focus on a different or unrelated set of operative facts."  *Lee's Ford Dock, Inc. v. Secretary of the Army*, 865 F.3d 1361,

1369 (Fed. Cir. 2017) (quoting *Placeway Constr. Corp. v. United States*, 920 F.3d 903, 907 (Fed. Cir. 1990)).

Here, although the government asserts that the claim at trial was for superior knowledge (*see* gov't br. at 20), we agree with CFD that it is not presenting such a cause of action (*see* app. reply br. at 1-2) and that the legal theory is the same as in its claim: CFD is seeking recovery for allegedly out of scope work performed by its FSRs on the contract (*id.*). The operative facts, however, are different. CFD's (much reduced) first claim, is limited to work on non-howitzer vehicles, meaning that the only claim addressing out of scope work on howitzers is the second claim, which asserts that the government required CFD to keep two employees at the motor pool, waiting on call to perform garage work (including howitzers damaged after they were deprocessed and turned over to the Iraqi army), a duty allegedly not required by the PWS.[13] What the second claim does not state is that CFD was required to do substantially more work than expected to deprocess the guns when they arrived. Does this factual difference matter, given the big picture? On the facts here, it does. CFD states in its opening brief that, "[p]erhaps the most significant reason for these [out of scope] repairs was the howitzers not arriving in -10/20 condition due to inadequate refurbishment at the depot," and then spends significant time detailing all of the ways that the howitzers were "trashed" when they arrived in Iraq for the CFD FSRs to deprocess (*see* app. br. at 18). These facts are different and unrelated to the motor pool claim (which complained of duty location and damage done to the howitzers by Iraqis *after* deprocessing) and, under any reading of *Scott Timber*, the "most significant" factual basis for a claim must be provided to the CO for his or her consideration before we possess jurisdiction over it. This conclusion is buttressed by the Spartan nature of the motor pool claim's facts with respect to out of scope work – at most, it consisted of a parenthetical about working on howitzers damaged by the Iraqis in training, while the majority of the very short claim complained of the requirement that some FSRs be present at the motor pool (*see* R4, tab 212 at 10). There would be no factual basis for the CO to engage in any kind of discussion with CFD about out of scope deprocessing work, which CFD now argues is the lion's share of its appeal. *Cf. Holk*, 90-3 BCA ¶ 23,086 at 115,938-39 (requiring claim to have sufficient detail to permit a dialog with the CO). Indeed, the size of the appeal has blossomed since CFD submitted its claims for $1,300,950 for out of scope work (half of which was for the now-diminished vehicles claim) to $2,903,151 for out of scope work (app. br. at 49). This provides further support for our finding that the most substantial factual basis for CFD's appeal was not brought before the CO in CFD's claims.

---

[13] The "motor pool" location allegations were not raised at the hearing or in CFD's post-hearing brief, but were, instead, subsumed by its general argument about out of scope work.

CFD argues that it informed the government, outside of the claim, of its out of scope work and that our law allows us to consider correspondence between the contractor and the government in determining the scope of a claim (app. reply br. at 4-5). CFD is correct that we do not consider claims in a vacuum and should consider pre-claim correspondence between the parties in determining the claim's meaning. *See, e.g., The Public Warehousing Company*, ASBCA No. 56022, 11-2 BCA ¶ 34,788 at 171,228. But we do not read the law to allow the use of outside correspondence to create additional claims not submitted to the CO; rather, the cases involve using correspondence to elaborate on a claim document or to put it into context. *See, e.g., id.; Vibration and Sound Solutions Ltd.*, ASBCA No. 56240, 09-2 BCA ¶ 34,257 at 169,270; *General Constr. Co., a Div. of Wright Schuchart, Inc.*, ASBCA No. 39983, 91-1 BCA ¶ 23,314 at 116,917. In any event, we have reviewed all of the citations to the record provided in CFD's brief to support its contention that pre-claim correspondence would have alerted the government to the deprocessing component of its claim (*see* app. reply br. at 4-5) and find that the correspondence and discussions failed to do so. To be sure, there is significant evidence that CFD complained that it was performing out of scope work repairing howitzers damaged after being turned over to the Iraqis, but none of its communications set forth the idea that significant out of scope work alleged was based upon the poor condition in which the howitzers were delivered to Iraq.[14] Indeed, in a "request for statement of work clarification" letter attached to a March 16, 2012 email from CFD to the government (and cited by CFD in support of this argument), CFD wrote at length about deprocessing as something required to be done under the contract, but never stated that the deprocessing was a problem or that the howitzers were requiring excessive work on deprocessing (R4, tab 67 at 6-8).

As noted above, at trial, Dr. Day indicated that he did not discuss the deprocessing problems in the claim because he did not have sufficient detail at the time (*see* tr. 2/226-28). CFD does not appear to raise that argument here, and we would not have found it compelling if it had since CFD was plainly in the best position to know what its employees were working on. Moreover, the requirement that there be the denial of a valid claim before we may exercise our jurisdiction over an appeal, *see Reflectone*, 60 F.3d at 1575, makes no exceptions when an appellant did not know of a claim.

---

[14] The closest any of the cited evidence comes to this was Ms. Ethington's testimony that some of the howitzers were shipped "short of some components or spare parts" (tr. 3/177), and a similar internal government statement in an email regarding howitzers being shipped short of parts which were later sent to Iraq (app. supp. R4, tab 585 at 2). This is not remotely equivalent to the allegations being advanced now.

15

Accordingly, we hold that we do not possess jurisdiction over that part of the appeal that seeks damages for the extra work required by CFD's FSRs as a consequence of the condition in which the howitzers were delivered to Iraq for deprocessing. We do, however, maintain jurisdiction over the damages caused by alleged out of scope work by requiring FSRs to wait at the motor pool and repairing howitzers damaged by the Iraqi Army.[15] We also possess jurisdiction over claim 1, involving work on non-howitzer vehicles and claim 3, seeking compensation for allegedly improper descoping of FSRs through Mod 5.

B. We Grant the Government's Motion to Strike Appendices 1 and 2 to CFD's Opening Post-Trial Brief

Attached to CFD's opening post-trial brief are three appendices, though only the first two are at issue. The first, 96 pages long, is Department of the Army Pamphlet 700-142, entitled "Instructions for Materiel Release, Fielding, and Transfer," and is dated June 25, 2010. The second document, 75 pages long, is Army Regulation 700-142, entitled "Type Classification, Materiel Release, Fielding, and Transfer," dated June 2, 2015. The government moves that they be struck because they were not timely submitted and because they address the subject matter of deprocessing over which, the government argued, we do not possess jurisdiction (gov't mot. to strike). CFD opposes the motion, arguing that we possess jurisdiction over deprocessing matters and that the appendices were merely being provided as a courtesy to the Board since they reflect legal authority, not new evidence (app. opp'n to mot. to strike). We have addressed the jurisdictional issue above; moreover, CFD's "legal authority" argument is not well taken under the context in which the documents are being offered.

Because we do not possess jurisdiction over the portion of the appeal to which the appendices appear to be material, we may strike them as irrelevant. We also strike them for their untimely submission. Board Rule 13 governs the evidence that we may consider in an appeal, with Rule 13(c) providing that, "[e]xcept as the Board may otherwise order, no evidence will be received after completion of an oral hearing." Rather than request that we make an exception to the prohibition against the submission of post-hearing evidence (which Rule 13(c) permits and we would have considered), CFD argues that it is not providing evidence, but merely providing us with helpful legal authority (app. opp'n to mot. to strike at 2). Not so.

We do not intend to enter into a deep semantic dive here, but observe that whether a document is "evidence" or whether it is "authority" depends upon for what

---

[15] Fortunately, as discussed below, we need not make the almost impossible calculation of exactly how much of the allegedly out of scope work was related to the condition in which the howitzers were delivered.

purpose it is being employed. Here, the documents are being utilized by CFD to support Dr. Day's testimony about the meaning of the term, "deprocessing" in the contract (*see* app. opp'n to mot. to strike at 2). That is, they are purportedly being used as evidentiary support for Dr. Day's interpretation of a contract term.[16] They are not used as legal authority instructing us how to interpret contract terms nor are they being used in the same sense as a statute or regulation setting forth legal rights and obligations. Thus, the two documents are being presented as evidence and, as such, are untimely. The motion to strike appendices one and two is granted.

## II. CFD is Not Entitled to Damages for a Constructive Change to the Contract

CFD's theory for why it should be entitled to relief for performing out of scope work upon the contract is that the government constructively changed the contract by requiring its employees to perform such out of scope work (app. br. at 29-30). It appears to us (as it did to COR Ethington and others in the government) highly likely that CFD FSRs performed some duties outside of the scope of the PWS while they were in Iraq, although perhaps not nearly as much as alleged since the terms "technical support" and "maintenance support" in the PWS are very broad,[17] as are the descriptions of FSR responsibilities contained in the CO's answers to contractor questions about the solicitation. It also appears to us likely that responsible government employees knew of such out of scope work and that the CO had some awareness of it, given CFD's complaints about it beginning in December 2011. We need not make such firm findings, however, because we conclude that any out of scope work did not increase CFD's costs beyond what it was required to incur performing the contract.

## A. To be Actionable, a Constructive Change Must Increase a Contractor's Costs

The theory of constructive change is to compensate a contractor for work that might properly have been directed through the contract's changes clause, but which was not. *See Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356,

---

[16] Were they used as legal authority in Dr. Day's testimony, of course, such testimony would have been improper, for fact witnesses do not testify about legal conclusions. *E.g.*, *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008).

[17] CFD provided testimony that "technical assistance" was limited to answering technical questions during deprocessing (*see* tr. 1/140-42, 2/126-27). There is no textual support for this allegation in the contract (which references "technical support" both in the section specifically about deprocessing and in the more general paragraph 6), and it is contradicted by the CO's answer to the question stating that the FSRs would remain in Iraq after deprocessing was complete.

17

1361 (Fed. Cir. 2016). To be eligible for damages under this theory, it must be proved that a contractor "performed work beyond the contract requirements, and...that the additional work was ordered, expressly or impliedly, by the government." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014). To obtain compensation under a contract's changes clause, the contractor must prove increased costs compared to what is otherwise required by the contract, *see, e.g., Norcoast Constructors, Inc.*, ASBCA No. 12751, 72-2 BCA ¶ 9699 at 45,285 (proper equitable adjustment is "the difference between the cost of the work required by the contract and the cost of the changed work, plus profit"), and, consistent with the paradigm that a constructive change is treated like recourse to the changes clause, we have required an increase in costs for there to be recovery. *E.g., S-TRON*, ASBCA Nos. 45893, 46466, 96-2 BCA ¶ 28,319 at 141,397.

B. CFD was Contractually Required to Provide 13 FSRs for 90 Hours per Week for at Least a Year, Potentially Three

The reason that CFD is entitled to no damages is that no reasonable reading of the contract is consistent with its theory that its deployed FSRs would work little overtime and that after completion of deprocessing and light assistance to the Iraqis, its FSRs could come home. To the contrary, a careful reading of the contract finds the more appropriate interpretation to be that CFD was required to provide the 13 FSRs for 4,680 hours each under CLINs 5 and 6.

To decide CFD's contractual obligations, we begin with the law of contract interpretation. Under basic principles of the law, a contract is interpreted "in terms of the parties' intent, as revealed by language and circumstance." *United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) (citations omitted). Generally, this process begins and ends with the language of the contract. *TEG-Paradigm Environmental, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). And in reviewing this language, the Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922; *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract"); *Hunkin Conkey Constr. Co. v. United States*, 461 F.2d 1270, 1272 (Ct. Cl. 1972) (rejecting contract interpretation that would render a clause in the contract meaningless).

Turning to the terms of the contract, as discussed earlier in this opinion, contrary to CFD's allegation (*see* app. reply br. at 11), the modifications to CLINs 5 and 6 did not, in fact, eliminate the hours required of the FSRs. Also, there is no textual basis or support for CFD's characterization of the 4,680 hours per FSR or the

18

number of FSRs as mere estimates that it could ignore if it could perform more efficiently (*see* tr. 1/47, 3/37; *see generally* app. reply br. 19-23).[18]

At the hearing, and to a lesser degree in its post-trial brief, CFD made much of the question and answer incorporated into the contract that stated that the FSR's needed only be "on call" for 90 hours per week, meaning that they would not actually work such long hours and that the government should thus be liable for any overtime they incurred working out of scope (*see, e.g.,* app. reply br. at 11). This argument does not hold up well under examination as this single question response cannot bear all the weight that CFD places upon it. First, the context of the question was about the sustainability of 90-hour workweeks as far as personnel went, not about how much salary costs would be incurred by the contractor. Moreover, the CO's answer to the question repeated that the workweek was a 90-hour one and never suggested otherwise.[19] Second, given the general work set-up in Iraq, it is not at all clear that anything other than the 12-hour days generally spent at the worksite would have been practicable even if the FSRs were not fully employed performing work strictly within the PWS.[20] These were the hours that CFD's employees expected to be working when they went to Iraq; it is what they were generally paid for; and it is what CFD promised the government it would provide when it successfully bid on the contract. Indeed, it is hard to escape the conclusion that CFD recognized these contractual obligations when Dr. Santens informed the government that it had underbid the contract in May 2011. Why CFD withdrew Dr. Santen's statement has never been satisfactorily explained.

With respect to the notion that the FSRs could have all come home after the last howitzer was deprocessed (*see* tr. 3/56-57; app. br. at 32; app. reply br. at 11-12), this idea is contrary to the language of the contract. First, the contract provided that there would be up to two option years with the full complement of FSRs at 4,680 hours per year per FSR. If the contract were to be completed after the delivery and deprocessing of a finite number of howitzers, options for tens of thousands of FSR-hours stretching more than two years past the last delivery of a howitzer would not have been needed –

---

[18] In his testimony, Mr. Rinaldi made a single statement that the hours set forth in the contract were "forecasted," but that was in the context of his explaining his view that the contract "bought hours" (tr. 4/64).

[19] CFD also presents an underdeveloped argument that actually requiring the hours set forth in CLINs 5 and 6 would create a forbidden personal services contract (*see* app. reply br. at 18 n.10, at 19 n.12). This is incorrect. A personal services contract is not created by minimum manning requirements, but by continuous government supervision of contractor employees. *See Sterling Services, Inc.*, ASBCA No. 46824, 94-2 BCA ¶ 26,912 at 134,006.

[20] To be sure, Mr. Rinaldi agreed that the phrase, "on call," did not mean to be on site 7 days a week for 12 hours (tr. 4/25), but, for practical reasons, the duty hours appeared to be just that.

at the very least they speak to a radically different understanding of the role of the FSR than that suggested by CFD here.[21] Any doubt to the significance of the option years should have been laid to rest by the CO's response to the question about what would happen to the FSRs after conclusion of the deprocessing, which agreed with the questioner that the FSRs would "remain on the ground" and support other howitzers. It was an unreasonable interpretation of the contract on CFD's part to ignore the hours set forth in CLINs 5 and 6 and to believe that it was essentially free to leave after completion of the deprocessing mission and the provision of other, minimal support.[22] Again, this interpretation is not what CFD promised to the government when it bid on the contract.

CFD argues that the PWS would be unnecessary if the 90-hour workweek language were kept in the contract (app. reply br. at 11-12), but that is not so. First, the PWS was part of the solicitation which included the 90-hour workweeks, so it plainly was intended to be part of the contract. Moreover, the PWS does have very important consequences even with a required 90-hour workweek: CFD's FSRs could have easily refused to perform any extra-PWS work if they so chose with no adverse consequences to themselves or the company, and CFD had no obligation to provide FSRs who could perform work beyond the PWS's dictates. Thus we do not read the contract to make the PWS redundant or unnecessary.

Accordingly, we conclude that the terms of the contract required deployment of the FSRs to Iraq for the full one-year term set forth in the CLINs, regardless of when the deprocessing work was completed. We further find that the expectation that the FSRs be "on call" for 90 hours per week did not effectively relieve CFD of its contractual obligation to provide the government 4,680 hours of annual work per FSR. We also find, as a practical matter, that the routine of performing the contract would have imposed 12-hour days at the worksite even if the FSRs were performing no out of scope work.

---

[21] Another indication of the radically divergent role of the FSR seen by CFD and the contract's terms is the number of hours. If deprocessing, as Mr. Andrews testified, took approximately one FSR day and there were only 144 howitzers requiring deprocessing, even accounting for some problems, the contract required an order of magnitude more FSR hours than CFD asserts should have been required.

[22] CFD has argued, or at least implied, that terms like "technical support" and "maintenance support" in the PWS indicate very little work beyond deprocessing (app. br. at 31). As noted above, we read them otherwise and see the terms as potentially very broad, encompassing a great deal of work, especially given the hours contemplated by the contract and the CO's responses to potential bidders' questions.

Because there is no evidence supporting a finding that extra-PWS work performed by CFD's FSRs increased CFD's costs beyond its contractual obligations. we deny ASBCA Nos. 60211 and 60212.

III.    Bilateral Modification 5 is Binding upon CFD and is Dispositive to Claim 3

ASBCA No. 60213 (claim 3) is based upon the notion that CFD fully performed CLINs 5 and 6 and should have been paid the full contract price for them rather than the discounted payment it agreed to when the parties decreased the number of FSRs through Mod 5 in early April 2012. Though Mod 5, as a bilateral modification, would normally obviate this claim,[23] CFD argues that it is invalid, having been secured through duress (app. br. at 38-40). CFD also argues that it received no consideration for Mod 5, providing an additional basis to find the modification ineffective (*id.* at 41-42). As discussed below, CFD has not met the high threshold necessary to prove duress. and Mod 5 certainly had consideration.

A. CFD has Not Proven that it Entered Mod 5 under Duress as Legally Defined

We entertain no doubt that CFD was in acute economic distress in March 2012 as the payroll expenses for the FSRs outstripped the amount of its receipts for the work. Though this might seem to be "duress" as the term is commonly used, the facts do not support a finding of the kind of duress that would support setting aside Mod 5.

The leading Federal Circuit case on economic duress is *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed. Cir. 2003). In *Freedom NY*, the court set forth a three-part test for setting aside an agreement for being entered under duress:

> To render a contract unenforceable for duress, the party "must establish that (1) it involuntarily accepted [the other party's] terms, (2) the circumstances permitted no other alternative, and (3) such circumstances were the result of [the other party's] coercive acts."

*Id.* at 1329 (brackets in original) (quoting *Dureiko v. United States*, 209 F.3d 1345, 1358 (Fed. Cir. 2000) and citing other cases); *see also Tacoma Boatbuilding Co.*, ASBCA No. 50238, 00-1 BCA ¶ 30,590 at 151,069 (similar test).

---

[23] The government refers to Mod 5 as an accord and satisfaction in its brief (gov't br. at 34). Technically, that is not what Mod 5 really is (it was not intended by the parties to effect resolution of a legal dispute, but, rather, to relieve financial pressure on CFD), but it would, nevertheless, operate to eliminate the contractual basis for claim 3. *See Supply & Service Team GmbH*, ASBCA No. 59630, 17-1 BCA ¶ 36,678 at 178,600.

21

Coercion, in the third component of duress here, "requires proof of wrongful action by the government." *Freedom NY*, 329 F.3d at 1330. And proof of wrongful action, the Federal Circuit elaborated,

> [R]equires a showing that the government's action...was (1) illegal, (2) a breach of an express provision of the contract without a good faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing.

*Id.* (citations omitted). CFD has not proved coercion as defined by the law.

CFD has made no allegation that the government engaged in any illegal act. Instead, depending on how one counts them, it alleges two or three actions that are arguably contrary to the terms of the contract or a breach of good faith and fair dealing. First, it alleges that Mr. Rinaldi threatened to terminate the contract for default, which would have been ruinous to CFD (app. br. at 39). As we found above, Mr. Rinaldi made no such threat. At most, COL Romero conveyed this threat once in December 2011, but it should have been very clear to CFD that he was "speaking out of school," had no authority to make such a threat, and that the officials who had such authority were not contemplating it. CFD also argues that Mr. Rinaldi threatened to exercise the option years on the contract, which would have been ruinous to it (*id.*). Since there is no contractual reason that the government should have been foreclosed from exercising this contractual right, we find that alleging this to be a coercive act is a *non sequitur*.

Perhaps, inartfully, CFD is making the argument that, by interpreting the contract as he did, that the government bought hours from the FSRs, Mr. Rinaldi implicitly threatened default if CFD packed up its FSRs and came home. This seems to be the best argument that CFD could make, but it, too, fails. To be coercive, even an incorrect contract interpretation by the government must be made "without a good faith belief that the action was permissible under the contract." *Freedom NY*, 329 F.3d at 1330. Here, as discussed above, the CLINs set forth the hours required by the contract, the questions and answers provided that the FSRs would remain in Iraq after the deprocessing, and CFD's own bid reflected the FSRs working 4,680 hours per year. Dr. Day even testified that, when he spoke with Mr. Rinaldi about the purchase of hours, Mr. Rinaldi referred him to a portion of the FAR which, *according to Dr. Day*, backed Mr. Rinaldi's interpretation of the contract provisions at issue (tr. 1/143-44). Despite CFD's argument that Mr. Rinaldi's interpretation of the contract was so self-evidently wrong that it must have been the product of bad faith (*see* app. br. at 40), the evidence supports a very different finding. Any mistake in contract interpretation (which we do not find occurred in any event) was not in bad faith.

A violation of the duty of good faith and fair dealing, too, can support a finding of coercion, *see Freedom NY*, 329 F.3d at 1330, but CFD does not elaborate on how the government's actions breached that duty here,[24] except its general allegations of bad faith contract interpretation and threats by the government (*see* app. br. at 39-40). We have found, factually, that there was no bad faith contract interpretation by the government and that CFD's allegations that there was an atmosphere of threats and "extortion" surrounding the execution of Mod 5 are unsupported and contradicted by the evidence, to say the least. We find that there was no violation of the duty of good faith and fair dealing as set forth by the controlling law. *See, e.g., Relyant*, 18-1 BCA ¶ 37,085 at 180,539 (citing, *inter alia, Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014); *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

We finally note that economic pressure caused by a company's own flawed business decision does not support a finding of duress. *See Fruhauf Southwest Garment Co. v. United States*, 111 F. Supp. 945, 951 (Ct. Cl. 1953). That is what we have here. Mod 5 may have been entered by a company in economic distress but it was not entered under duress as the law defines that term.

## B. The Agreement to Descope FSRs through Mod 5 was Supported by Ample Consideration

CFD's final argument regarding Mod 5 is that it was entered without consideration, making it ineffective (*see* app. br. at 41-42). As CFD would have it, since it had no obligation to provide FSRs after the deprocessing work was completed, it gained nothing from the government's agreement to descope them (*id.*). This argument, of course, rests upon a faulty contract interpretation: as discussed above the questions and answers incorporated into the contract clearly provided that the FSRs were obligated to remain in Iraq for the period of performance, even after deprocessing was complete. The descoping action in Mod 5, by allowing CFD to cease paying the salaries of those FSRs no longer required by the modified contract, was to CFD's benefit (CFD was certainly in favor of Mod 5 at the time it executed it). That benefit constitutes consideration. *See, e.g., Supply & Service Team*, 17-1 BCA ¶ 36,678 at 178,602.

Because Mod 5 was effective, we deny ASBCA No. 60213 (claim 3).

---

[24] CFD's brief does not cite any cases providing the elements of this duty, nor does it purport to apply them to this case.

## CONCLUSION

For these reasons,[25] we deny the appeals.

Dated:  November 29, 2018

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

MICHAEL T. PAUL
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60211, 60212, 60213, Appeals of Charles F. Day & Associates LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

---

[25] CFD made allegations in its complaint regarding alleged breach involving the government's alleged failure to provide security after the expiration of the SOFA (amended and restated compl. ¶¶ 45-46).  Since these were not presented in its claims, in the evidence at trial, or in its post-trial brief, we deem them waived.